912 A.2d 658

Thomas ROSKELLY, et al.

v.

Linda H. LAMONE, et al.

No. 141, Sept. Term, 2005.

Court of Appeals of Maryland.

Dec. 11, 2006.

Mark J. Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., William F. Brockman, Asst. Atty. Gen., on brief), Robert A. Zarnoch, Asst. Atty. Gen. (Kathryn M. Rowe, Asst. Atty. Gen., on brief), for appellees.

James H. West (John H. West, III, West & Costello, LLC, Towson, on brief), for appellants.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BELL, C.J.

This case involves the early voting legislation enacted by the Maryland General Assembly. Senate Bill 478, passed by the General Assembly two days before the end of the 2005 legislative session, ultimately became Chapter 5, Laws of Maryland 2006, and was codified as a new § 10–301.1 of the Election Law Article, Maryland Code (2003, 2006 Cum.Supp.). It

provided for early voting, eight hours each day for a five-day period beginning the Tuesday before a primary or general election through the Saturday before the election, at early voting sites, which each local board of elections was required to establish in its jurisdiction. Passed by both the Senate and the House of Delegates on April 9, 2005, SB 478 was vetoed by the Governor on May 20, 2005. The Governor's veto was overridden by both houses on January 16, 2006. Thus, pursuant to Article II, § 17(d) of the Maryland Constitution,[1] SB 478 became law on February 16, 2006.

A second piece of legislation, House Bill 1368, also related to early voting, was introduced and enacted, as emergency legislation, during the 2006 legislative session. That bill, which became Chapter 61, Laws of Maryland 2006, repealed and reenacted with amendments the new, recently passed § 10–301.1 of the Election Law Article. As amended, § 10–301.1 altered early voting as prescribed by SB 478, by extending the hours of early voting from eight hours daily to eleven hours and specified, either generally[2] or with particularity,[3] where early voting would take place in each county and the City of

---

1. MD CONST. art. II, § 17(d) provides:

 "(d) Any Bill vetoed by the Governor shall be returned to the House in which it originated immediately after the House has organized at the next regular or special session of the General Assembly. The Bill may then be reconsidered according to the procedure specified in this section. Any Bill enacted over the veto of the Governor, or any Bill which shall become law as the result of the failure of the Governor to act within the time specified, shall take effect 30 days after the Governor's veto is over-ridden, or on the date specified in the Bill, whichever is later. If the Bill is an emergency measure, it shall take effect when enacted. No such vetoed Bill shall be returned to the Legislature when a new General Assembly of Maryland has been elected and sworn since the passage of the vetoed Bill."

2. In all but the largest counties, Charles County, and Baltimore City, the statute prescribed that the early voting locations would be in the county seat, without specifying the exact location.

3. In Anne Arundel, Baltimore, Harford, Howard, Montgomery and Prince George's Counties and Baltimore City, HB 1368 designated the specific early voting locations to be used. In Charles County, it specified that the early voting location would be in Waldorf.

Baltimore. HB 1368 was passed on March 29, 2006, and vetoed by the Governor on April 7, 2006. Both houses overrode the veto on April 10, 2006, and, again, pursuant to Article II, § 17(d) of the Maryland Constitution, HB 1368 became law.

On April 19, 2006, Marylanders for Fair Elections, Inc. ("MFFE") and its chairman, Thomas Roskelly ("Roskelly"), collectively "the appellants," initiated the referral process provided for in Article XVI of the Maryland Constitution [4] by requesting an advance determination [5] of the summaries of SB 478 and HB 1368 they proposed for placement on the signature pages of the referendum petition. On April 25, 2006, the Attorney General wrote Linda Lamone ("Lamone"), the State Administrator of the Maryland State Board of Elections ("the Board"), copying Roskelly, regarding the "Summaries of SB 478 and HB 1368 for Referendum Petition." Having suggested amendments to the summaries of the bills proposed, and advised Lamone that she was "authorized to approve a summary that is consistent with this letter," he addressed "the subject of the advance determination, but that will relate to

---

**4.** MD CONST. art. XVI, § 1 provides:

"(a) The people reserve to themselves power known as The Referendum, by petition to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly, if approved by the Governor, or, if passed by the General Assembly over the veto of the Governor;

"(b) The provisions of this Article shall be self-executing; provided that additional legislation in furtherance thereof and not in conflict therewith may be enacted."

**5.** Maryland Code (2003, 2006 Cum.Supp.) § 6–202 of the Elections Law Article permits petition sponsors to obtain from the State Administrator an advance determination of the sufficiency of the format of the petition. It provides:

"(a) *In General.*—The format of the petition prepared by a sponsor may be submitted to the chief election official of the appropriate election authority, in advance of filing the petition, for a determination of its sufficiency.

"(b) *Advice of legal authority.*—In making the determination, the chief election official may seek the advice of the legal authority."

"Chief election official" is defined "... as to the State Board, the State Administrator; or ... as to a local board, the election director."

whether these bills may ultimately be petitioned for referendum." With respect to that and with reference to prior petition efforts, the Attorney General, citing, and enclosing, Letter from Assistant Attorney Generals Robert A. Zarnoch and Bonnie A. Kirkland to Honorable Donald H. Dwyer, Jr. (April 26, 2005) and 62 Opinions of the Attorney General 405 (1977),[6] noted that office's conclusion "that a petition drive for referendum must occur immediately after the session of the Legislature at which the bill is initially passed by the Legislature."

Having obtained approval of the summaries to be placed at the top of referendum petition signature pages, MFFE proceeded to collect the necessary signatures. Article XVI, § 3(a) of the Maryland Constitution prescribes the threshold requirements for a referendum petition. It provides, as relevant:

"(a) The referendum petition against an Act or part of an Act passed by the General Assembly, shall be sufficient if signed by three percent of the qualified voters of the State of Maryland, calculated upon the whole number of votes cast for Governor at the last preceding Gubernatorial election, of whom not more than half are residents of Baltimore City, or of any one County. . . . "

Although a law passed by the General Assembly that is not an emergency law ordinarily "shall take effect [on] the first day of June next after the session at which it may be passed," Article XVI, § 2 provides for the delay of the law's effective date. This is accomplished "if before said first day of June there shall have been filed with the Secretary of the State a petition to refer to a vote of the people any law or any part of a law capable of referendum" and if the requirements of Article XVI, § 3(b) have been met. Section 3(b) provides, as relevant:

---

6. In that opinion, Attorney General Burch concluded that when the General Assembly repeals or amends a referred bill in good faith, the referendum concerning the original legislation should be removed from the ballot.

"(b) If more than one-third, but less than the full number of signatures required to complete any referendum petition against any law passed by the General Assembly, be filed with the Secretary of State before the first day of June, *the time for the law to take effect and for filing the remainder of signatures to complete the petition shall be extended to the thirtieth day of the same month with like effect.*" [7]

(Emphasis added).

On May 31, 2006, MFFE submitted 20,221 signatures in support of its petition to refer Senate Bill 478, Chapter 5, Laws of Maryland 2006, to the vote of Maryland's registered voters. Although more than the number required to be filed at that time, 17,062, or 1 percent of the full number of signatures required to complete the referendum petition, the number of signatures submitted was fewer than the number recommended by the Board of Elections to be filed.[8]

On June 8, 2006, Lamone, one of the appellees,[9] wrote Roskelly, concurrently sending him a facsimile, informing him that, pursuant to Maryland Code (2003, 2006 Cum.Supp.) § 6–

---

7. Section 3(b) addresses another scenario, not relevant in this case, where the bill is passed close to the June 1st effective date. In those cases, it provides as follows:
 "If an Act is passed less than 45 days prior to June 1, it may not become effective sooner than 31 days after its passage. To bring this Act to referendum, the first one-third of the required number of signatures to a petition shall be submitted within 30 days after its passage. *If the first one-third of the required number of signatures is submitted to the Secretary of State within 30 days after its passage, the time for the Act to take effect and for filing the remainder of the signatures to complete the petition shall be extended for an additional 30 days.*"
 (Emphasis added).

8. The Board of Elections had recommended that the petitions "be signed by at least 20% more than the number required, since past experience indicates that a substantial number of signatures are likely to be invalid," and that "[i]n jurisdictions where residents move frequently, the invalidity rate may be higher."

9. The Maryland State Board of Elections is the other appellee in this case.

206(c)(5) of the Election Law Article,[10] MFFE's "petition relating to Senate Bill 478 is deficient and may not be referred to referendum for reasons stated in the enclosed letter dated June 8 from the Office of the Attorney General." The Attorney General's letter expanded the rationale set forth in his April 25, 2006 letter. Specifically, it stated:

"(1) Senate Bill 478 (2005) may not be referred to referendum at this time because a referendum effort must occur immediately after the regular session at which the legislation is initially passed. Thus, the required signatures should have been filed no later than June 1, 2005. In addition, because most of the provisions of Senate Bill 478 were subsequently amended by House Bill 1368 (2006), those provisions of the bill may not be petitioned to referendum."

The letter stated further:

"An effort to petition a bill to referendum is governed by Article XVI of the Constitution. Section 1(a) of Article XVI

10. Maryland Code (2003, 2006 Cum.Supp.) § 6–206(c) of the Election Law Article provides:

"(c) *Declaration of deficiency.*—The chief election official shall declare that the petition is deficient if the chief election official determines that:

"(1) the petition was not timely filed;

"(2) after providing the sponsor an opportunity to correct any clerical errors, the information provided by the sponsor indicates that the petition does not satisfy any requirements of law for the number or geographic distribution of signatures;

"(3) an examination of unverified signatures indicates that the petition does not satisfy any requirements of law for the number or geographic distribution of signatures;

"(4) the requirements relating to the form of the petition have not been satisfied;

"(5) based on the advice of the legal authority:

"(i) the use of a petition for the subject matter of the petition is not authorized by law; or

"(ii) the petition seeks:

"1. the enactment of a law that would be unconstitutional or the election or nomination of an individual to an office for which that individual is not legally qualified to be a candidate; or

"2. a result that is otherwise prohibited by law; or

"(6) the petition has failed to satisfy some other requirement established by law."

makes it clear that a bill that becomes effective over the veto of the Governor may be petitioned to referendum.[ ] However, the Article makes no further reference to a veto or override and instead addresses petition-gathering in all circumstances and governing time-frames.

\* \* \*

"[T]here are several possible interpretations of Article XVI as it applies to the timing of a referendum. Under one possible reading, MFFE's filing of signatures a year after the veto would be timely because petitioners were not required to do anything unless and until the veto was overridden, which did not happen until January 17, 2006.

\* \* \*

"Another possible reading of Article XVI is that the General Assembly's override of the Governor's veto triggers a new right to gather signatures until May 31 (or June 30) of the subsequent year. In support of such an interpretation, § 3(c) of Article XVI defines passage as 'any final action' by both houses and does not include a veto override in the definition of enactment.

\* \* \*

"If the Constitution were construed to provide for petition drives to begin after a veto override, it would likely result in such bills becoming effective for several months and then suddenly being suspended if the requisite number of valid signatures were obtained. In the case of Senate Bill 478, which took effect on February 16, 2006, or thirty days after the veto override, the legislation would be suspended on June 1st. This seems at odds with the scheme set out in Article XVI. For example, emergency legislation that has already become effective is not suspended by the submission of petitions signed by a relatively small percentage of the electorate; rather such legislation remains effective until rejected by a majority of voters at the polls. In addition, under such a construction of the Constitution, the organizers of a petition drive would likely have more than double the amount of time that the framers deemed adequate for

gathering signatures for bills that were not vetoed.[ ] This possible interpretation thus appears illogical and contrary to the basic scheme of Article XVI.

"The most sensible interpretation of Article XVI is that MFFE had until May 31 'next after the [2005] session' at which the bill was passed to gather the first one-third of the signatures. Such a construction does not double the signature-gathering period or create the illogical result of legislation taking effect on February 16, 2006, only to be suspended on June 1, 2006.[ ]"

Cognizant that "the timing of the referendum drive in these circumstances is an issue of first impression," and, thus, that a court might not agree with his conclusion, the Attorney General recommended that the local boards of election proceed with the verification of the referendum signatures "so that the referendum process may continue without interruption in the event that a court reaches a different conclusion."

Consistent with that latter advice, and for the reason the Attorney General gave, Lamone informed Roskelly that the local boards of elections nevertheless would continue to verify signatures pursuant to § 6-210(c) of the Election Law Article.[11]

Subsequently, on June 21, 2006, Lamone once again wrote to Roskelly, again sending the letter by mail and by facsimile. In that letter, she reported that the local boards of elections had completed the validation of the signature pages submitted in connection with Senate Bill 478, with the result that 16,924 names had been validated and accepted. As this was 138 fewer than the number required, as a threshold, to be submitted by May 31, 2006, she further informed Roskelly that the verification process would not continue. Lamone also revisited her June 8 letter, calling Roskelly's attention to its deficien-

---

**11.** Maryland Code (2003, 2006 Cum.Supp.) § 6-210(c) of the Election Law Article provides:

"(c) *Verification and counting.*—The verification and counting of validated signatures on a petition shall be completed within 20 days after the filing of the petition."

cy determination, and pointing out that it had not been challenged within ten days, as required by § 6–210(e)(1) of the Election Law Article.[12] She concluded, therefore, that because MFFE had not challenged her June 8 deficiency determination in a timely fashion, for that reason, as well, the referendum petition process for Senate Bill 478 would not continue.[13]

## A.

On June 27, 2006, nineteen (19) days after Lamone's June 8 determination, Roskelly filed, in the Circuit Court for Anne Arundel County, a Verified Complaint and an Emergency Motion for Judicial Review. The complaint sought a declaratory judgment that Lamone's deficiency determination was both substantively and procedurally flawed.

Roskelly rejected the premise of the Lamone deficiency determination—that Article XVI required the referendum process to be initiated in 2005, in the same year in which the law to be referred was passed. He argued, instead, that, because the General Assembly overrode the Governor's veto of Senate Bill 478 in 2006, the petition did not have to be filed in 2005, but could be filed, as it was, in 2006. Pointing out that "pass" and "passed," are defined terms, meaning "*any final action*

---

12. Section 6–210(e)(1) provides:
 "(e)(1) Except as provided in paragraph (2) of this subsection, any judicial review of a determination, as provided in § 6–209 of this subtitle, *shall be sought by the 10th day following the determination to which it relates.*"
 (Emphasis added).

13. MFFE's referendum effort with regard to House Bill 1368, Chapter 61, Laws of Maryland 2006, was more successful. On May 31, 2006, Roskelly filed petitions containing 20,687 signatures of Maryland voters in support of that effort. Lamone informed Roskelly by separate letter, dated June 21, that MFFE had submitted enough signatures for the petition process to continue for House Bill 1368.
 As we have seen, House Bill 1368 was passed as an emergency measure. Article XVI, § 2 of the Maryland Constitution provides, as relevant: "An emergency law shall remain in force notwithstanding such petition, but shall stand repealed thirty days after having been rejected by a majority of the qualified electors voting thereon."

upon an Act or part of an Act by both Houses of the General Assembly," Article XVI, § 3(c) (emphasis added), Roskelly notes that "signatures on a petition for referendum on an Act or part of any Act may be signed at any time *after the Act or part of an Act is passed.*" Article XVI, § 3(d) (emphasis added). Thus, he continued, because Senate Bill 478 was "passed," when the General Assembly overrode the Governor's veto, it could still be referred to the registered voters of the State for decision. This is consistent, Roskelly maintained, with Article XVI, § 1(a) of the Maryland Constitution, which authorizes Maryland citizens "to approve or reject at the polls, any Act, ... *passed by the General Assembly over the veto of the Governor.*" (Emphasis added). In short, Roskelly argued that the veto override by the General Assembly constituted an "Act" by the General Assembly in response to which referendum petitions could be filed.

Next, Roskelly submitted that Lamone's deficiency determination was untimely as that determination could only be made once a "petition" had been filed. Noting that a "petition," as defined by § 6–101(i) of the Election Law Article,[14] includes "all of the associated pages necessary to fulfill the requirements of a process ... for: (1)[p]lacing ... a question on the ballot at any election," he argued that such a determination could not occur until the "completed petition" was filed. Because the submission of one-third of the required signatures contemplated the later submission of the remaining two-thirds, it is clear, he proffers, that the petition was not completed, nor intended to have been completed, on May 31, 2006. Indeed, relying on Article XVI, §§ 2 and 3(b), Roskelly states that

---

**14.** Maryland Code (2003, 2005 Cum.Supp.) § 6–101(i) of the Election Law Article provides:

"(i) 'Petition' means all of the associated pages necessary to fulfill the requirements of a process established by the law by which individuals affix their signatures as evidence of support for:

"(1) placing the name of an individual, the names of individuals, or a question on the ballot at any election;

"(2) the creation of a new political party; or

"(3) the appointment of a charter board under Article XI-A, § 1A of the Maryland Constitution."

completion could, and necessarily would, have occurred at anytime on or before June 30, 2006. Accordingly, Roskelly argued, Lamone's June 8 deficiency determination was "premature" and the MFFE was *not* required to seek judicial review within ten days of notice of it. In other words, he asserts that Lamone was required to wait until June 30, 2006, before making any deficiency determination or before verifying signatures.

For this proposition, Roskelly relied on § 6–207(a) of the Election Law Article,[15] which provides that "[u]pon the filing of a petition, and unless it has been declared deficient under § 6–206 of this subtitle, the staff of the election authority shall proceed to verify the signatures contained in the petition." [16]

---

**15.** Maryland Code (2003, 2006 Cum.Supp.) § 6–207(a) of the Election Law Article provides:

" § 6–207. Verification of signatures
"Generally
"(a)
"(1) Upon the filing of a petition, and unless it has been declared deficient under § 6–206 of this subtitle, the staff of the election authority shall proceed to verify the signatures and count the validated signatures contained in the petition.
"(2) The purpose of signature verification under paragraph (1) of this subsection is to ensure that the name of the individual who signed the petition is listed as a registered voter."

**16.** Despite arguing that signature verification could not proceed until the complete petition was filed, that is, until June 30, Roskelly, recognizing the threshold requirement to trigger a thirty day delay in the effective date of a law sought to be referred, maintained that the threshold had been met. Under this argument, because verification could not proceed in the absence of a completed petition, satisfaction of the threshold requirement must be based on the raw numbers, without regard to verification. The fact that the signatures the appellants submitted exceeded the number of signatures then required to be filed, however, necessarily reflects Roskelly's understanding that the referendum would only be triggered by the requisite number of valid signatures.

Roskelly also complained about the accuracy of the verification or validation of the first 1 percent of the signatures he submitted. He maintained that a number of signatures mailed to the Board inadvertently had been delivered after the May 31, 2006 deadline. Had those signatures "been delivered by the post office as they should have been," Roskelly argued, "an estimated additional 500 signatures in support of a referendum on Senate Bill 478, more than sufficient to meet the

Lamone filed an Opposition to the Emergency Motion for Judicial Review. She contended that, in addition to having failed to gather the required number of signatures by May 31, 2006, Roskelly failed to seek judicial review in the ten days following her June 8 determination. Accordingly, she concluded, he was foreclosed from proceeding with the referendum petition on Senate Bill 478. Alternatively, Lamone contended that Senate Bill 478 was not subject to referendum, in any event, because the petition process was neither initiated nor completed in 2005 and, just as important, by the time of the challenge in 2006, the non-emergency legislation not only had taken effect, but it had been substantively amended.

Following a hearing, on June 30, 2006, the Circuit Court announced its decision. Defining the threshold issue to be whether the appellants' motion for judicial review was timely filed and, ultimately, whether it was time barred, the court found the motion to have been untimely filed and, thus, time barred.

The court rejected what it characterized as the appellants' essential argument, the single petition argument, that "the time clock does not start because there has not yet been filed a petition." It was persuaded to do so by the scheme prescribed by the Constitution, that authorized satisfaction of the three percent requirement could take place in two steps, which, when utilized, required the successful completion of the first as a prerequisite to the viability and, thus, the validity, of

threshold, would have been submitted by the initial filing deadline of May 31."

In addition, Roskelly was unhappy with the results obtained when the new statewide voter registration database, known as "MD Voters," which he asserted was prone to mistakes, was used to verify signatures. He proffered, as an example, Montgomery County, where a cross-check with the legacy database discovered 121 valid signatures that had been reported as invalid by the "MD Voters" database. Complaining that Lamone refused to accept this cross-count, he asked that the local boards of elections be ordered to recheck all previously invalidated signatures.

These arguments are pertinent only if Roskelly's notice argument has merit. As we determine that it does not, we need not, and therefore, do not, consider or address them.

the second. Further, unless the requisite number of signatures is submitted timely in the first step, the right to submit the remainder is not engaged, and thus there simply is then no entitlement to pursue and complete the second.

The Circuit Court reasoned:

"it seems to me completely incongruous to consider the document or the documents that were filed on or before May 31st as being anything less than or anything other than a petition. It is not a complete petition, to be sure, but the language that is in the Constitution makes it quite clear to me at least that it is a petition nonetheless and that the process that takes place between May 31 and June 30 is the completion of the petition."

Having concluded that "the petition process can be a single petition or ... it can be fragmented into two installments essentially. One that's requiring only a third of the signatures and then the other requiring the balance," the court addressed whether the validation of the signatures was required to proceed as to each petition, seriatim, or to both, as a whole. It concluded:

"it would seem to me completely nonsensical to suggest that a process which has these two components could allow the first component to be a number of signatures that are not valid and then at the end come in with the valid signatures. It's quite clear that you've got to have ... at least a third of the signatures and they must be valid signatures."

Moreover, the Circuit Court concluded that Lamone was required not only to review the petition, but also to determine its sufficiency and to verify the signatures it contained. Section 6–206(a) of the Election Law Article [17] requires the chief election official to review a petition promptly upon its filing with an election authority. Pursuant to § 6–206(c), upon

---

17. Maryland Code (2003, 2006 Cum.Supp.) § 6–206(a) of the Election Law Article provides:

"(a) *Review by chief election official.*—Promptly upon the filing of a petition with an election authority, the chief election official of the election authority shall review the petition."

making any of the enumerated findings, *see* note 9, *supra*, "the chief election official shall declare that the petition is deficient." Noting that, in this case, Lamone declared the petition deficient, "based on the advice of the legal authority," § 6–206(c)(5), for being untimely—it should have been submitted prior to June 1, 2005—and that, having made that determination, as it was required to do, and notified the appellants of that fact, the court determined that the June 8 determination triggered the appellants' right to judicial review under § 6–210(e). When they did not file suit until June 27, more than ten-days after that determination, the court found that the action was time-barred.[18]

---

**18.** Roskelly contended that, because he was on vacation when the June 8 determination letter was sent and did not actually receive the letter until he returned from vacation on June 17, he was not "notified" of the deficiency determination until that day. Furthermore, he observed that no one from the Board of Elections attempted to contact him by telephone, or otherwise, to ascertain whether the deficiency determination letter had been received. This denied him the opportunity to investigate Lamone's letter and research the applicable law to formulate a challenge, he maintained. Arguing that this is a violation of his due process rights, he believes that the ten-day limitation period should begin on the date of "actual" receipt.

The Circuit Court rejected this argument, as do we. First, § 6–210 of the Election Law Article requires notice; it does not require actual notice. Nor does it require that the chief election official ensure receipt of a deficiency determination by a petition sponsor or, by phone or otherwise, to investigate whether the sponsor has received the determination. Section 6–210 provides only that "the chief election official of the election authority shall notify the sponsor of the determination" and that judicial review "shall be sought by the 10th day following the determination to which it relates." Such a requirement, as Roskelly suggests, moreover, would place an unreasonable burden on the election official and, rather than ensure, certainty, it would have the opposite effect. It simply is unworkable.

What Roskelly advocates is not the law in Maryland. Maryland Rule 7–203(a) provides:

"Except as otherwise provided in this Rule or by statute, a petition for judicial review shall be filed within 30 days after the latest of:

"(1) the date of the order or action of which review is sought;

"(2) the date the administrative agency sent notice of the order or action to the petitioner, if notice was required by law to be sent to the petitioner; or

"(3) the date the petitioner received notice of the agency's order or action, if notice was required by law to be received by the petitioner."

The appellants noted an appeal to this Court and concurrently filed a petition for writ of certiorari, which we granted

Subsection (a) of this Rule was applied in *Kim v. Comptroller of the Treasury*, 350 Md. 527, 714 A.2d 176 (1998), a case similar to the case *sub judice*. There, the Maryland Tax Court, acting pursuant to Md. Code (1988, 1997 Repl.Vol.), § 13–529(c) of the Tax–General Article, a statute requiring that "[t]he clerk of the Tax Court shall certify the order in an appeal and mail a copy of the certified order to: (1) each party to the appeal; and (2) the tax determining agency from which the appeal is taken," mailed its order to Kim, rather than serving it on him. This Court rejected Kim's argument that, in so doing, the Tax court erred, holding instead:

"In the instant case, the Tax Court was required by law to send its written order to Kim and the Comptroller.... Therefore, under the statute and Rule 7–203(a)(2), the relevant date governing the timeliness of an action for judicial review was the date the written order of the Tax Court was filed and mailed to the parties.... Thus, Kim's petition for judicial review should have been filed within 30 days after [the date of mailing]."

*Kim*, 350 Md. at 533, 714 A.2d at 178.

*Kim* is to be compared with *Rockwood Cas. Ins. Co. v. Uninsured Employers' Fund*, 385 Md. 99, 867 A.2d 1026 (2005), which reached a different result under the statute applicable to that case. In *Rockwood*, the Court of Appeals concluded that the term "serve" implies actual receipt. Rockwood involved application of Maryland Code (1995, 2003 Repl.Vol.) § 19–406(a) of the Insurance Article, which required that, to cancel a workers' compensation insurance policy, the insured must "serve[ ] on the employer, by personal service or registered mail addressed to the last known address of the employer, a notice of intention to cancel the policy." Ins. § 19–406(a). The Court of Appeals determined that cancellation of a policy could be accomplished only by the insured's actual receipt of the notice.

*See also* Maryland Rule 2–613(c), governing notice of default judgments (stating that notice is given once it is "mailed to the defendant at the address stated in the request and to the defendant's attorney of record, if any"); *Mardirossian Family Enterprises v. Clearail, Inc.*, 324 Md. 191, 198, 596 A.2d 1018, 1022 (1991) ("the inclusion in the mechanics' lien law of registered mail as an expressly authorized manner of giving notice is strongly indicative of a legislative intent that a notice sent by registered mail within the statutory period complies even though receipt occurs beyond the statutory period." (*quoting Riley v. Abrams*, 287 Md. 348, 356, 412 A.2d 996, 1000 (1980) (footnote omitted))); *First American Bank v. Shivers*, 97 Md.App. 405, 422, 629 A.2d 1334, 1343 (1993) (holding that a bank's failure to notify objecting shareholder of effective date of approved merger with another bank by required method of delivering notice personally or mailing it by certified mail, return receipt requested, rendered given notice ineffective, notwithstanding shareholder's alleged lack of diligence resulting in his failure to receive actual notice until after running of statutory period within which to receive fair market value of his shares).

on July 5, 2006. We heard argument in the case on July 25, 2006, and issued an order affirming the judgment of the trial court on that same day, with opinion to follow. *Roskelly v. Lamone,* 393 Md. 363, 902 A.2d 1173 (2006). We now explain the reasons for our decision.

### B.

The people of Maryland reserved to themselves the Referendum—the power, by petition, to refer an Act, or any part of one, passed by the General Assembly, with gubernatorial approval, or over the Governor's veto, to the registered voters of the State, for their approval or rejection at the polls. Article XVI, § 1(a). A referendum petition is sufficient, however, only if, prior to the effective date of the Act, it is filed with the Secretary of State and it contains the signatures of three percent of the qualified voters of the State, as defined in the Constitution. Article XVI, §§ 2 and 3(a). When the effective date of an Act of the General Assembly is, as this one was, the usual effective date, the petition will be effective if it contains at least one-third of the required number of signatures, or a number equivalent to one percent of the qualified voters, and is submitted prior to June 1, and the balance of the required signatures is submitted prior to June 30. Article XVI, § 3(b).

Although the referendum petition must be filed with the Secretary of State, the State Board of Elections and the State Administrator of Elections, by statute, *see* Maryland Code (2003, 2006 Cum.Supp.) Title 6 of the Election Law Article ("EL"), have been given significant responsibilities in the referendum process. The State Board is required to adopt regulations and prepare guidelines and instructions relating to the petition process, EL § 6–103,[19] and receive, from the

---

**19.** Maryland Code (2003, 2006 Cum.Supp.) § 6–103 of the Election Law Article provides:

"(a)

"(1) The State Board shall adopt regulations, consistent with this title, to carry out the provisions of this title.

Secretary of State, the referendum petitions filed in that office, which the Secretary of State is required to deliver within 24 hours. EL § 6–205(a)(2).[20]

Upon the receipt by the State Board of a petition, the State Administrator promptly must review it. EL § 6–205(a). In addition to any advance determinations authorized by EL § 6–202, the State Administrator is required to make appropriate determinations, *i.e.*, that the petition is deficient, EL § 6–206(c), that it is sufficient as to all matters other than the validity of the signatures, EL § 6–206(b)(1), or that the sufficiency determination should be deferred pending further review. EL § 6–206(b)(2). Unless the petition has been declared deficient, the State Administrator's staff "shall proceed to verify the signatures and count the validated signatures contained in the petition." EL § 6–207(a). Thereafter,

"At the conclusion of the verification and counting processes, the [State Administrator] shall:

"(1) determine whether the validated signatures contained in the petition are sufficient to satisfy all requirements

---

"(2) The regulations shall:
"(i) prescribe the form and content of petitions;
"(ii) specify procedures for the circulation of petitions for signatures;
"(iii) specify procedures for the verification and counting of signatures; and
"(iv) provide any other procedural or technical requirements that the State Board considers appropriate.
"(b)
"(1) The State Board shall:
"(i) prepare guidelines and instructions relating to the petition process; and
"(ii) design and arrange to have printed sample forms conforming to this subtitle for each purpose for which a petition is authorized by law.
"(2) the guidelines, instructions, and forms shall be provided to the public, on request, without charge."

20. Maryland Code (2003, 2006 Cum.Supp.) § 6–205 of the Election Law Article provides, as relevant:
 "If the Maryland Constitution provides that a petition shall be filed with the Secretary of State, the Secretary of State shall deliver the petition to the State Board within 24 hours."

established by law relating to the number and geographical distribution of signatures; and

"(2) if it has not done so previously, determine whether the petition has satisfied all other requirements established by law for that petition and immediately notify the sponsor of that determination, including any specific deficiencies found."

EL § 6–208(a).[21] The process of verifying and counting the validated signatures "shall be completed within 20 days after the filing of the petition," EL § 6–210(c), and certification of the outcome shall occur within two business days of completion of the verification and counting process, or, if judicial review is pending, within 2 business days after a final judicial decision. EL § 6–210(d).

A person aggrieved by the State Administrator's determination either as to sufficiency of the petition or the number of signatures "may seek judicial review." *See* § 6–209(a)(1) (referencing EL §§ 6–206 and 6–208(a)(2)).[22] A petition for judicial review of such a determination, however, "shall be sought by the 10th day following the determination to which it relates." EL § 6–210(e)(1).

In her letter to Roskelly, dated June 8, 2006, Lamone advised the appellants:

"Pursuant to Maryland Code Election Law Article Section 6–206(c)(5), I have determined that the petition relating to Senate Bill 478 is deficient and may not be referred to referendum for the reasons stated in the enclosed letter dated June 8 from the Office of the Attorney General."

This determination was indeed consistent with the advice the Attorney General previously had given Lamone on April

---

21. Of course, the State Administrator also must certify the successful completion of the petition process if the petition has satisfied the lawful requirements. EL § 6–208(b).

22. Because the petition in this case is a statewide petition and refers to an enactment of the General Assembly pursuant to Article XVI of the Constitution, the petition is required to be filed, as it was in this case, in the Circuit Court for Anne Arundel County. EL § 6–209(a)(1)(ii).

25, 2006, that "a petition drive for referendum must occur immediately after the session of the Legislature at which the bill is initially passed by the Legislature," and that the repeal or amendment of a referred bill, in good faith, voided the referendum process and required removal of the issue from the ballot. And it was what she was required by law to do. As we have seen, EL § 6–206 requires the chief election official to make appropriate determinations with respect to the referendum petition's sufficiency or deficiency. Under subsection (c)(5)(i), the chief election official shall declare the petition deficient, if she determines, "based on the advice of the legal authority: the use of the subject matter of the petition is not authorized by law."

In her letter to Roskelly dated June 21, 2006, Lamone informed the appellants of yet another deficiency in their petition, this one being their failure to file the requisite number of signatures to engage the referral process. Specifically, she advised the appellants, as required by § 6–208(a)(1), that the number of validated signatures they submitted on May 31 was not "sufficient to satisfy all requirements established by law relating to the number … of signatures," they did not amount to one-third of the full number of signatures needed to complete the referendum petition, and, thus, that the time for filing the signatures necessary to complete the petition was not extended.

It is undisputed that the appellants did not seek judicial review within ten days of the mailing of the June 8 letter—the appellants filed their verified complaint and emergency motion for judicial review on June 27, 2006, eight days beyond that time period, but within ten days of Lamone's June 21 letter. If, as Lamone maintains and the trial court found, the June 8 letter contained a determination by Lamone, that determination was properly and timely made and mailed to the appellants, the appellants sought judicial review too late and we must affirm the trial court's dismissal of their action, notwithstanding the timeliness of the action with respect to signature count and validation.

The appellants renew in this Court the argument they advanced in the Circuit Court, that the determination by the State Administrator in the June 8 letter was premature since their May 31 submission, because it was not complete, *i.e.* did not contain the full number of the required signatures and contemplated a subsequent filing, was not the petition.[23] Proceeding from that premise, they further argue that the signature validation process also was premature—until the complete petition is filed, they maintain, neither a determination as to the sufficiency or deficiency of the incomplete petition nor the sufficiency of the number of signatures it contains is appropriate.

As did the Circuit Court, we reject the appellants' arguments. We note at the outset, whether correct or not, an issue that we need not decide here; Lamone advised the appellants, consistent with her counsel's advice, that their attempt to refer Senate Bill 478 to referendum was untimely, as the petition was not filed in the year it was passed. That was a determination of deficiency she was required by § 2–206(c)(5) to make. The appellants did not timely respond to this determination by seeking judicial review. In rejecting the

---

**23.** Roskelly's argument in this regard proceeds largely on his interpretation of certain provisions of the Election Law Article, *e.g.* §§ 6–101(i), *see* note 12, *supra;* 6–201(a) (stating that "[a] petition shall contain: (1)[a]n information page; and (2)[s]ignature pages containing not less than the total number of signatures required by law to be filed"), as referring only to the *final* deadline in the referendum process. We do not agree. In any event and more important, it is the Constitutional provisions that control. Statutes enacted in supplementation and aid of the Constitutional provisions, do not trump those provisions, and we have said as much in the past. *See In re Legislative Districting of the State,* 370 Md. 312, 373, 805 A.2d 292, 328 (2002) (noting that accepting a "rational goal" as a basis for avoiding a clear requirement under a section of the Maryland Constitution is to allow a constitutional mandate to be overridden by a non-constitutional one, and that to interpret a constitutional provision as to subjugate it or any of its component constitutional requirements to lesser principles and non-constitutional considerations or factors would be to amend the constitution without the involvement of the most critical players: the State's citizens). *See also In re Legislative Redistricting Cases,* 331 Md. 574, 629 A.2d 646 (1993) (Eldridge, J., dissenting) (finding it impermissible to subjugate constitutional mandates to lesser principles).

appellants' arguments, we are required to construe provisions of the Maryland Constitution, in particular, Article XVI, §§ 2 and 3. The principles guiding our task are well settled.

As early as 1873, this Court recognized that where a "general rule for the construction of statutes" exists, there "can be no good reason suggested why this same general principle . . . should not also apply as a rule of interpretation of the Constitution." *New Central Coal Co. v. George's Creek Coal and Iron Co.*, 37 Md. 537, 557 (1873). We continue to adhere to that principle. *Bienkowski v. Brooks*, 386 Md. 516, 536–537, 873 A.2d 1122, 1133–35 (2005). *See Davis v. Slater*, 383 Md. 599, 604, 861 A.2d 78, 81 (2004) ("When interpreting constitutional provisions, we generally employ the same rules of construction that are applicable to the construction of statutory language."); *Fish Market v. G.A.A., Inc.*, 337 Md. 1, 8, 650 A.2d 705, 708 (1994); *Luppino v. Gray*, 336 Md. 194, 204 n. 8, 647 A.2d 429, 434 n. 8 (1994) ("The rules governing the construction of statutes and constitutional provisions are the same"); *Andrews v. Governor of Maryland*, 294 Md. 285, 290, 449 A.2d 1144, 1147 (1982) ("in ascertaining the meaning of a constitutional provision, we are governed by the same rules of interpretation which prevail in relation to a statute"); *Brown v. Brown*, 287 Md. 273, 277, 412 A.2d 396, 398 (1980) (the same rules that are applicable to construction of statutory language are employed in interpreting constitutional verbiage); *Perkins v. Eskridge*, 278 Md. 619, 639, 366 A.2d 21, 36–37 (1976) (observing that the same rules apply in constructional construction as apply in statutory construction).

 Thus, to ascertain the mandate of constitutional amendment, the court looks first to the natural and ordinary signification of the language; if that language is clear and unambiguous, the court need not look elsewhere. *Rand v. Rand*, 280 Md. 508, 511, 374 A.2d 900, 902 (1977). Moreover, "we consider the history of the provision, the evils to be remedied, as well as the objects to be attained by its adoption. The standard we have enunciated for this purpose is:

"[C]onstitutions are not to be interpreted according to the words used in particular clauses. The whole must be considered, with a view to ascertain the sense in which the words were employed, and its words must be taken in their ordinary and common acceptation, because they are presumed to have been so understood by the framers and by the people who adopted it.... It [the Constitution], unlike the Acts of our legislature, owes its whole force and authority to its ratification by the people, and they judged of it by the meaning apparent on its face.... [*Manly v. State*, 7 Md. 135, 147 (1854).]"

*Andrews v. Governor of Maryland*, 294 Md. at 290, 449 A.2d at 1147. *See also Comptroller v. Phillips*, 384 Md. 583, 591, 865 A.2d 590, 594 (2005) ("If the plain language . . . is unambiguous and is consistent with the [enactment's] apparent purpose, we give effect to the [enactment] as it is written"). We will not construe a provision so as to re-draft it under the guise of construction or so as "to assume an Alice in Wonderland world where words have no meaning." *Davis v. State*, 294 Md. 370, 378, 451 A.2d 107, 111 (1982), *quoting Welsh v. United States*, 398 U.S. 333, 354, 90 S.Ct. 1792, 1803, 26 L.Ed.2d 308, 326 (1970) (concurring opinion).

Moreover, when the meaning of a word or phrase in a constitutional or statutory provision is perfectly clear, this Court has consistently refused to give that word or phrase a different meaning on such theories that a different meaning would make the provision more workable, or more consistent with a litigant's view of good public policy, or that the framers of the provision did not actually mean what they wrote. *See, e.g., Montrose Christian School v. Walsh*, 363 Md. 565, 595, 770 A.2d 111, 129 (2001) (The "phrase 'to perform purely religious functions' clearly does not mean what is suggested.... We decline to construe 'purely' as if it were 'primarily' or 'some' "); *Dodds v. Shamer*, 339 Md. 540, 554, 663 A.2d 1318, 1325 (1995) (refusing to construe a statute, specifically applicable to only four named counties, as applicable to other counties); *Mauzy v. Hornbeck*, 285 Md. 84, 93, 400 A.2d 1091, 1096 (1979) (refusing to construe the statutory phrase "all

professional employees" as "only certain types of" professional employees); *State Farm Mutual v. Insurance Commissioner*, 283 Md. 663, 671, 392 A.2d 1114, 1118 (1978); *Wheeler v. State*, 281 Md. 593, 598, 380 A.2d 1052, 1054 (1977), *cert. denied*, 435 U.S. 997, 98 S.Ct. 1650, 56 L.Ed.2d 86 (1978) ("We are not at liberty to bring about a different [constitutionality] result by inserting or omitting words" in the enactment).

■ A common sense reading of Article XVI, §§ 2 and 3 leads to the unmistakable conclusion that a submission containing more than one third, but less than all, of the full number of signatures necessary to complete a referendum petition, submitted to the Secretary of State before June 1 for the purpose of extending the time for filing the signatures to complete the referendum petition within the meaning and contemplation of the Election Law Article, is, indeed, a petition. Section 2 of Article XVI states, as relevant, that "[n]o law enacted by the General Assembly shall take effect until the first day of June next after the session at which it may be passed . . .," unless "before said first day of June there shall have been filed with the Secretary of the State a petition to refer to a vote of the people any law or part of a law capable of referendum" and the requirements of § 3(a) and or (b) have been met, in which case the law sought to be referred "shall be referred by the Secretary of State to such vote." Neither § 3(a) nor § 3(b) contradicts § 2 with regard to what must be filed—"a petition to refer to a vote of the people any law or any part of a law capable of referendum"—or its timing. In fact, § 3(a), addressing its sufficiency, *i.e.* the number of signatures needed, refers to "[t]he referendum petition." Section 3(b), on the other hand, prescribing an alternative to the filing of the full number of signatures by the deadline set by § 2 and, therefore, focusing on the number of signatures necessary to be filed to extend the time for filing additional signatures, refers to the referendum petition in that context. Thus, it speaks in terms of "signatures required to complete any referendum petition" and extending the time for filing "the remainder of signatures to complete the petition."

Under § 3(a), a submission, timely filed, purporting to contain the full number of signatures required to refer a referable law to the voters, would qualify as a petition. It would be complete as filed. On the other hand, pursuant to § 3(b), not all of the required signatures need be filed at once. When the proponent of a referendum files with the Secretary of State, before June 1, the signatures of at least one percent, or more, but less than three percent, the full number required, of all qualified voters, the time for filing the remainder of the signatures will be extended to June 30. To be sure, therefore, a two-step process for filing signatures to refer a law to referendum is permitted, but not required, by § 3(b). But the fact that the Constitution recognizes and blesses two related, but procedurally different, approaches to the referral process does not mean that it also recognizes two different triggers for that process. After all, that a proponent of a referendum is permitted to file the signatures required to engage the process in two increments does not change the process substantively, only procedurally; the process and the requirements to engage it remain essentially the same.

To refer a law to the vote of the people requires, whether done in one step or two, the filing, before the constitutionally prescribed deadline, of a minimum number of signatures with the Secretary of State. Section 2 of Article XVI states explicitly what is to be filed, a "petition." That is true whether the filing is to be a single one or two. To be successful, both requirements—the filing of the petition and the requisite number of signatures before June 1—must be met. Although in the case of the two-step process, an additional thirty days, is afforded for the gathering and filing of the signatures, that additional time is obtainable only when the threshold filing of the petition, containing a specified number of signatures, has timely occurred. Entitlement to proceed to the second step, in other words, is dependent upon the sufficiency of the compliance in the first step. Accordingly, it is clear both from the clear and ambiguous language of § 2 and the Constitutional scheme as a whole, that the referral process is initiated by the filing of a referendum petition by

the June 1 deadline,[24] whether that petition contains the minimum number of signatures required to extend that deadline or the full number required.

Our conclusion that the referral process is triggered by a referendum petition even when the referendum proponents are proceeding pursuant to § 3(b) disposes of the appellants' arguments. Thus, because what the appellants filed was a referendum petition, the State Administrator was required to, as she did, review it, EL § 6–205(a), with an eye toward determining its sufficiency or deficiency and making the required determinations. EL § 6–206. To be sure, the State Administrator advised the appellants of her conclusion that the petition was deficient and she was not required to do more. Nevertheless, again following counsel's advice and aware of the possibility that her deficiency determination might be rejected by a court, she proceeded to verify the signatures and count the validated ones. EL § 6–210. In addition to the reasons stated, this was done, and was necessary, precisely because the appellants' right to file additional signatures was dependent on whether they had filled the required number prior to the deadline. Whether a referendum petition filed pursuant to § 3(b) is valid is determined by reference to whether it contained, when filed, the required number of valid signatures—more than one-third of the number needed to complete the petition. It would be an absurd result if, without a requirement of signature verification and validation, the deadline for filing the full number of the required signatures were extended on the basis of a petition containing unsubstantiated and, perhaps, invalid signatures, which would be subject to validation and verification, along with the subsequently filed signatures. To read Article XVI,

---

24. The respondents argue, as we have seen, that the Maryland Constitution does not permit the referral of a non-emergency law that has already taken effect and/or that has been amended in a subsequent legislative session and that Roskelly disagrees, contending that referral is proper, where the final act of passage of the law was the override of the Governor's veto and the override occurred in a year subsequent to the bill's initial passage. We need not address this issue in this case. *See,* however, *Lamone v. Capozzi,* 396 Md. 53, 912 A.2d 674 (2006).

§§ 2 and 3 and EL § 6–206 in this way would facilitate, if not encourage, the timely filing of "sham" petitions, solely for the purpose of extending the deadline to June 30, with the hope of obtaining the requisite signatures during the extension period. If the framers had wished to allow this scenario under Article XVI, they would not have established the June 1 deadline in the first place. *See Yox. v. Tru Rol Co., Inc.,* 380 Md. 326, 337, 844 A.2d 1151, 1157 (2004) ("We do not interpret statutes in ways that produce absurd results that could never have been intended by the Legislature").

COSTS TO BE PAID BY THE APPELLANTS.