912 A.2d 674

**Linda H. LAMONE, et al.**

v.

**Marirose Joan CAPOZZI, et al.**

**No. 143, Sept. Term, 2005.**

Court of Appeals of Maryland.

Dec. 11, 2006.

Donna Hill Staton, Deputy Attorney General and Michael D. Berman, Assistant Attorney General of Maryland (Margaret Ann Nolan, Steven M. Sullivan and William F. Brockman, Assistant Attorneys General; Kathryn M. Rowe, Assistant Attorney General, of MD), on brief, for appellants.

M. Albert Figinski (Christopher R. West of MD), on brief, for appellees.

Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BELL, C.J.

This is the second of two cases involving early voting in Maryland. In *Roskelly v. Lamone,* 396 Md. 27, 912 A.2d 658 (2006), this Court considered a petition to refer Senate Bill 478 (2005), the act, *see* Chapter 5, Laws of Maryland 2006, establishing early voting in Maryland, to the voters for ratification. Concluding that the appellants, the proponents of the referendum, had been advised of the determination by the State Administrator of Elections that their petition was deficient because it had not been filed timely, but did not timely seek judicial review, we affirmed the judgment of the Circuit Court for Anne Arundel County, which had dismissed their action. 396 Md. at 47, 912 A.2d at 670.

The early voting scheme was substantially amended during the 2006 session of the General Assembly by House Bill 1368 (2006), Chapter 61, Laws of Maryland 2006. Marirose Joan Capozzi, Bettye B. Speed, and Charles W. Carter, the appellees herein, have challenged the constitutionality of the act [1]. In the instant case, we address the constitutionality of early voting, probing whether the acts establishing the process are inconsistent with, and, thus, in derogation of, the Maryland Constitution.

A.

The Maryland Constitution designates when elections in Maryland will occur. Article XV, § 7 of the Maryland Constitution provides:

---

1. The full relief requested by the appellees in their complaint read:
   "RELIEF
   "26. In view of the foregoing, as elaborated upon and explicated by the accompanying Points and Authorities, this Court should declare Chapter 5 of the 2006 Laws of Maryland and portions of Chapter 61 of the 2006 Laws of Maryland, insofar as they purport to allow 'early voting,' as well as any other implementing legislation, unconstitutional and enjoin Defendants, the State of Maryland, Linda H. Lamone and the Maryland State Board of Elections, from implementing in any way said 'early voting.' "

" § 7.   General elections

"All general elections in this State shall be held on the Tuesday next after the first Monday in the month of November, in the year in which they shall occur."

Other constitutional provisions, addressing specific elections, are consistent, *e.g.*, Article XVII, § 2,[2] Article II, § 2,[3] and Article IV, § 3.[4] Specifically, Article XV, § 7 of the Maryland Constitution states that all elections in Maryland "shall be held on the Tuesday next after the first Monday in the month

---

2.   Article XVII, § 2 of the Maryland Constitution provides:
" § 2.   Time of elections for State and county officers
"Except for a special election that may be authorized to fill a vacancy in a County Council under Article XI–A, Section 3 of the Constitution, elections by qualified voters for State and county officers *shall be held on the Tuesday next after the first Monday of November,* in the year nineteen hundred and twenty-six, and on the same day in every fourth year thereafter."
(Emphasis added).

3.   Article II, § 2 of the Maryland Constitution provides:
" § 2.   Election procedure for Governor and Lieutenant Governor
"An election for Governor and Lieutenant Governor, under this Constitution, *shall be held on the Tuesday next after the first Monday of November,* in the year nineteen hundred and seventy-four, and on the same day and month in every fourth year thereafter, at the places of voting for Delegates to the General Assembly;  and every person qualified to vote for Delegate, shall be qualified and entitled to vote for Governor and Lieutenant Governor;  the election to be held in the same manner as the election of Delegates, and the returns thereof, under seal, to be addressed to the Speaker of the House of Delegates, and enclosed and transmitted to the Secretary of State, and delivered to said Speaker, at the commencement of the session of the General Assembly, next ensuing said election."
(Emphasis added).

4.   Article IV, § 3 of the Maryland Constitution provides, as relevant:
" § 3.   Judicial elections;  term of office;  retirement
"Except for the Judges of the District Court, the Judges of the several Courts other than the Court of Appeals or any intermediate courts of appeal shall, subject to the provisions of Section 5 of this Article of the Constitution, be elected in Baltimore City and in each county, by the qualified voters of the city and of each county, respectively, all of the said Judges to be *elected at the general election to be held on the Tuesday after the first Monday in November,* as now provided for in the Constitution."
(Emphasis added).

of November, in the year in which they shall occur." Article XVII, § 2 of the Maryland Constitution states that "elections by qualified voters for State and county officers shall be held on the Tuesday next after the first Monday of November, in the year nineteen hundred and twenty-six and on the same day in every fourth year thereafter." Article II, § 2 of the Maryland Constitution states that the "election of Governor and Lieutenant Governor, under this Constitution, shall be held on the Tuesday next after the first Monday of November." Article IV, § 3 of the Maryland Constitution states that judges of the Circuit Courts shall be elected "at the general election to be held on the Tuesday after the first Monday in November." Thus, historically, the general elections occur on one day, the first Tuesday after the first Monday in November, specified by Article XV, § 7 of the Maryland Constitution.[5]

The Maryland Constitution also addresses, in Article I, "The Elective Franchise," recognizing two methods of exercising it, one it prescribes expressly and the other it authorizes the General Assembly to prescribe. The first method, "by ballot," the Maryland Constitution expressly provides for. It is contained in Article I, § 1, which defines who may vote, where he or she may vote, and the qualifications for doing so. Captioned "Elections by ballot, qualifications to vote," it provides:

"All elections shall be by ballot. Every citizen of the United States, of the age of 18 years or upwards, who is a resident of the State as of the time for the closing of registration next preceding the election, *shall be entitled to vote in the*

---

**5.** Maryland Code (2003, 2006 Cum.Supp.) § 8–301 of the Election Law Article provides, as relevant:

"8–301. Date of general election.
"(a) *In general.*—
"(1) There shall be a statewide general election in each even-numbered year.
"(2) A statewide general election shall be held on the Tuesday following the first Monday in November."
*See* discussion *infra* concerning the General Assembly's authorization, pursuant to Article III, § 49 of the Constitution, to enact statutes, including clarifying ones, not inconsistent with the Constitution.

*ward or election district in which he resides at all elections to be held in this State.* A person once entitled to vote in any election district, shall be entitled to vote there until he shall have acquired a residence in another election district or ward in this State."

(Emphasis added).

Under this provision, the ballot must be cast in-person and at the polling place in the ward or election district in which the voter resides.[6] Because Article I, § 1 provides that a voter is entitled to vote in his residential election district or ward "until he shall have acquired a residence in another election district," a voter who moves from one ward or election district and acquires a new residence in another may only vote in the newly acquired ward or election district.

The second method of voting is by "Absentee Voting," to address those situations when voters, for whatever reason, are unable to vote in-person, at his or her designated polling station on the designated day. While, unlike voting "by ballot," the Maryland Constitution itself does not mandate absentee voting, it authorizes the General Assembly to do so. Article I, § 3, entitled "Absentee Voting," of the Maryland Constitution, provides:

> "The General Assembly of Maryland shall have power to provide by suitable enactment for voting by qualified voters of the State of Maryland who are absent at the time of any election in which they are entitled to vote and for voting by other qualified voters who are unable to vote personally and for the manner in which and the time and place at which such absent voters may vote, and for the canvass and return of their votes."

The Constitution, in addition to Article 1, § 3, also delegates to the General Assembly a significant role in the regulation of the election process. *See* Article III, § 49.[7] Pursuant to this

---

**6.** By contrast, "an 'Absentee ballot' means a ballot not used in a polling place." Maryland Code (2003, 2006 Supp.) § 1–101(b) of the Election Law Article.

**7.** MD CONST. art. III, § 49 provides:

provision, it is empowered to enact laws to regulate "all matters" relating to elections, including election judges, their "time, place, and manner" and the manner of making election returns. The General Assembly's authority in this area is subject to one, albeit significant, limitation: its regulation and the laws it enacts may not be "inconsistent with this Constitution;" the statutes and regulations enacted by the General Assembly to govern the exercise of the elective franchise must be consistent with the constitutional provisions that provide for the exercise of the elective franchise and which they supplement.

The General Assembly, acting pursuant to Article III, § 49, has taken seriously its responsibility to regulate all aspects of Maryland elections. The many statutes it has enacted are codified in the Election Law Article ("EL"). Maryland Code (2003, 2006 Cum.Supp.). Many of the statutes involve in-person, ballot voting, *e.g.* Title 9, Subtitles 1 and 2 of the Election Article, which, *inter alia,* they aim to facilitate, make uniform and make more reliable. For example, EL § 9–205 and 9–206 dictate the Content and Arrangement of the words on the ballot, EL § 9–210 dictates how candidates names shall be listed on all ballots, and EL § 9–208 explains that, if there is a late change or error in the ballots, the local board shall reprint the ballot if there is enough time, or print a sufficient number of stickers to be affixed to each ballot incorporating the change or correction, taking steps also to notify all candidates of the changes.

Moreover, EL § 9–101 of the Election Law Article establishes that "a voting system for voting in polling places and a voting system for absentee voting," shall be selected and certified, and that this certified system "shall be used in all counties." EL § 9–101(b). This voting system requires that "all voting shall be cast by ballot," EL § 9–201(a)(1), and that "only votes cast on a ballot shall be counted." EL § 9–

---

"The General Assembly shall have the power to regulate by Law, not inconsistent with this Constitution, all matters which relate to the Judges of election, time, place, and manner of holding elections in this State, and of making returns thereof."

201(a)(2). The State Board of Elections certifies these ballots and each local board of elections prepares the ballots in accordance with the State Board of Elections' prescription, EL § 9–202(b), such that each ballot is "easily understandable by voters," EL § 9–203(1), and "as uniform as possible." EL § 9–204(a).

The General Assembly also has acted, pursuant to the authority given it by Article 1, § 3, to provide "by suitable enactment" for qualified voters "who are absent at the time of any election in which they are entitled to vote," and "who are unable to vote personally," to vote and "for the manner in which and the time and place" where they may do so. *See* Title 9 Subtitle 3. The right to vote absentee applies to every Maryland election. EL § 9–301. The State Board is required to establish guidelines for the administration of absentee voting by the local boards of election, EL § 9–303, each of which is required to keep a record of absentee voting. EL § 9–302.[8] EL § 9–304 prescribes who may vote absentee. Although it now states simply, "An individual may vote by absentee ballot except to the extent preempted under an applicable federal law," before its amendment by Chapter 6, § 1, Maryland Laws 2006, it set out a series of circumstances that comported with the dictates of Article 1, § 3. *See* Maryland Code (2003, 2005 Cum.Supp.) § 9–304 of the Election Law Article.[9] Absentee ballots may be obtained from the

---

**8.** Maryland Code (2003, 2006 Supp.) § 9–302 of the Election Law Article provides:

"Each local board shall maintain a full record of absentee voting in the county, including, for each absentee voter:

"(1) the date and time of the board's receipt of an application for an absentee ballot;

"(2) the action taken with regard to the application;

"(3) the appropriate ballot style;

"(4) the date of issuance of a ballot;

"(5) if mailed, the address to which the ballot is sent;

"(6) the date and time of the receipt of a voted absentee ballot; and

"(7) any other information specified by the State Board."

**9.** Maryland Code (2003, 2005 Cum.Supp.) § 9–304 of the Election Law Article stated, before amendment:

local board of elections by filling out an Absentee Ballot Application. EL § 9–305(a).[10]  An absentee voter may use an agent in the absentee voting process and that agent may pick up and deliver the absentee voter's ballot, EL § 9–307,[11] or an

"(a) A registered voter may vote by absentee ballot at an election if the voter:

"(1) may be absent on election day from the county in which the voter is registered;

"(2) because of accident, illness, or physical disability, will be unable to go to the polling place on election day;

"(3) because of confinement in or restriction to an institution, will be prevented from going to the polling place on election day;

"(4) because of a death or serious illness in the voter's immediate family, will be unable to go to the polling place on election day;

"(5) is a full-time student at an institution of higher education located outside the voter's precinct but within the county of registration, and academic requirements prevent the voter from going to the polling place on election day; or

"(6) because of employment by or service as an official of the State Board or a local board, is required to be absent from the precinct in which the voter is registered to vote on election day.

"(b) An individual may vote by absentee ballot if authorized under an applicable federal law."

10.  Maryland Code (2003, 2006 Cum.Supp.) § 9–305(a) of the Election Law Article provides:

" § 9–305.  Applications for absentee ballot
         "Generally

"(a) An application for an absentee ballot, signed by the voter, may be made:

"(1) on a form produced by the local board and supplied to the voter;

"(2) on a form provided under federal law; or

"(3) in a written request that includes:

"(i) the voter's name and residence address; and

"(ii) the address to which the ballot is to be mailed, if different from the residence address."

Prior to it amendment by Chapter 6, § 1, Maryland Laws 2006, this provision required an applicant for absentee ballot to include in his or her written request for the ballot, "the reason, as authorized in § 9–304 of this subtitle, for absentee voting."

11.  Maryland Code (2003, 2006 Cum.Supp.) § 9–307 of the Election Law Article provides:

"(a) *Use authorized.*—A qualified applicant may designate a duly authorized agent to pick up and deliver an absentee ballot under this subtitle.

"(b) *Qualifications of agent.*—An agent of the voter under this section:

"(1) must be at least 18 years old;

absentee voter may use a special envelope provided by the State Board. EL § 9–310. An absentee voter may also receive assistance in marking his or ballot. EL § 9–308. By utilizing this method of voting, a voter who is unable to vote personally on Election Day may exercise his or her elective franchise.

The General Assembly, on April 9, 2005, two days before the end of the 2005 legislative session, passed Senate Bill 478, which authorized early voting in Maryland. This bill was intended to give Maryland voters a second alternative to in-person balloting, absentee balloting being the other. The Governor vetoed the bill on May 20, 2005. Early in the next legislative session, on January 16, 2006, both houses of the General Assembly overrode the Governor's veto, enacting Senate Bill 478, as Chapter 5, Maryland Laws 2006. *See* Article II, § 17(d) of the Maryland Constitution.[12] A new § 10–301.1 thus was added to the Election Law Article. That section permitted voters to vote early, eight hours each day for a five-day period beginning the Tuesday before a primary or general election through the Saturday before the election

---

"(2) may not be a candidate on that ballot;

"(3) shall be designated in a writing signed by the voter under penalty of perjury; and

"(4) shall execute an affidavit under penalty of perjury that the ballot was:

"(i) delivered to the voter who submitted the application;

"(ii) marked and placed in an envelope by the voter, or with assistance as allowed by regulation, in the agent's presence; and

"(iii) returned to the local board by the agent."

12. MD CONST. art. II, § 17(d) provides:

"(d) Any Bill vetoed by the Governor shall be returned to the House in which it originated immediately after the House has organized at the next regular or special session of the General Assembly. The Bill may then be reconsidered according to the procedure specified in this section. Any Bill enacted over the veto of the Governor, or any Bill which shall become law as the result of the failure of the Governor to act within the time specified, shall take effect 30 days after the Governor's veto is over-ridden, or on the date specified in the Bill, whichever is later. If the Bill is an emergency measure, it shall take effect when enacted. No such vetoed Bill shall be returned to the Legislature when a new General Assembly of Maryland has been elected and sworn since the passage of the vetoed Bill."

day, at sites designated by the local board of elections as early voting sites. At least three locations were required to be established in Anne Arundel, Harford, Howard, Montgomery, Prince George's and Baltimore Counties and in Baltimore City.

During the 2006 legislative session, another bill pertaining to early voting, House Bill 1368, was introduced and passed, as emergency legislation. That bill repealed § 10–301.1 and reenacted it with amendments. As amended, § 10–301.1 extended the early voting period from eight hours to eleven hours daily and specified, either generally [13] or with particularity,[14] where early voting would take place in each county and Baltimore City. HB 1368 was passed on March 29, 2006 and vetoed by the Governor on April 7, 2006. Both houses overrode the Governor's veto on April 10, 2006, thus enacting HB 1368. Chapter 61, Laws of Maryland 2006.

On July 16, 2006, the appellees, registered voters in Queen Anne's County, Maryland, filed, in the Circuit Court for Queen Anne's County, a Verified Complaint for Declaratory and Injunctive Relief [15] against the appellants, the State of Maryland, Linda Lamone, in her capacity as Administrator of the Maryland State Board of Elections, and the Maryland State Board of Elections. They alleged in the complaint that § 10–301.1 of the Election Law Article was enacted in derogation of Article I, § 1, Article XV, § 7, and Article XVII, §§ 1 [16] and

---

13. In all but the largest counties, Charles County and Baltimore City, HB 1368 prescribed that the early voting locations would be in the County Seat, without specifying the exact location.

14. In Anne Arundel, Baltimore, Harford, Howard, Montgomery and Prince George's Counties and Baltimore City, HB 1368 expressly designated the early voting locations to be used. In Charles County, it specified that the early voting location would be in Waldorf, MD.

15. Filed simultaneously therein were a Motion for Summary Judgment, a Motion for Temporary Restraining Order and Preliminary Injunction, and a memorandum of points and authorities.

16. Article XVII, § 1 of the Maryland Constitution provides:
" § 1.  Purpose; definition of officers

2 [17] of the Maryland Constitution. In essence, the appellees complained that early voting was not authorized by any part of the Constitution, as the provisions of Article I only acknowledged two ways to vote: in-person ballot voting and absentee balloting.

The case was transferred on July 28, 2006, upon motion of the appellants and pursuant to Maryland Code (1974, 2002 Repl.Vol., 2006 Cum.Supp.) § 6–201 of the Courts and Judicial Proceedings Article,[18] to the Circuit Court for Anne Arundel County. The appellants filed an opposition to the appellees'

---

"The purpose of this Article is to reduce the number of elections by providing that all State and county elections shall be held only in every fourth year, and at the time provided by law for holding congressional elections, and to bring the terms of appointive officers into harmony with the changes effected in the time of the beginning of the terms of elective officers. The administrative and judicial officers of the State shall construe the provisions of this Article so as to effectuate that purpose. For the purpose of this Article only the word 'officers' shall be construed to include those holding positions and other places of employment in the state and county governments whose terms are fixed by law, but it shall not include any appointments made by the Board of Public Works, nor appointments by the Governor for terms of three years."

17. Article XVII, § 2 of the Maryland Constitution provides:
" § 2. Time of elections for State and county officers
"Except for a special election that may be authorized to fill a vacancy in a County Council under Article XI–A, Section 3 of the Constitution, elections by qualified voters for State and county officers shall be held on the Tuesday next after the first Monday of November, in the year nineteen hundred and twenty-six, and on the same day in every fourth year thereafter."

18. Maryland Code (1974, 2002 Repl.Vol., 2006 Supp.) § 6–201 of the Courts and Judicial Proceedings Article provides:
" § 6–201. *In general*
"(a) Subject to the provisions of §§ 6–202 and 6–203 and unless otherwise provided by law, a civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation. In addition, a corporation also may be sued where it maintains its principal offices in the State.
"(b) If there is more than one defendant, and there is no single venue applicable to all defendants, under subsection (a), all may be sued in a county in which any one of them could be sued, or in the county where the cause of action arose."

Motion for Temporary Restraining Order and Preliminary Injunction, and their own motion to dismiss the complaint for failure to state a claim upon which relief may be granted. At the hearing, the appellants argued that Article I, § 1 was not a prohibitory provision; rather, they maintain, it merely sets forth the *entitlement* to vote of those who meet its enumerated qualifications. Stated differently, its "goal was not to restrict voters from voting outside of their district, but to prevent the Legislature from forcing voters to travel great distances—especially in the times of horse and buggy—to exercise their franchise."[19]

Thereafter, on August 8, 2006, the Circuit Court issued its Memorandum Opinion. In the accompanying Order, it held that § 10–301.1 and the implementing legislation were unconstitutional and void. The court concluded, specifically, "the provisions in early voting that would allow some voters to cast votes in a district or ward other than the one in which they reside are inconsistent with the language of Article I, Section 1."[20] Relying on *Kemp v. Owens,* 76 Md. 235, 238, 24 A. 606, 607 (1892), in which this Court stated that "[one] cannot lawfully vote in a ward or election district in which he does not resides, even though that ward or election district be within the legislative district or county where he has residence," and *Smith v. Hackett,* 129 Md. 73, 76–77, 98 A. 140, 141 (1916), in which we noted that "[t]he only condition imposed by the

---

**19.** The appellants also argued that Article I, § 1 of the Maryland Constitution was applicable only to the general election, and not to the primary election. The Circuit Court rejected that argument, explaining:

"such a reading could lead to an absurd result, as it would eliminate *all* Constitutional qualifications for primary elections. Thus, a 12–year–old, non-U.S. citizen, residing in Virginia, would not be barred by the Constitution from voting in the Maryland primary election."

In addition, noting that Article I, § 1 begins with the phrase *"all* elections," it was satisfied that there could be no doubt that the voter location qualification is applicable to all elections, primary and general elections.

**20.** Inconsistencies between the constitutional provisions and the statutes enacted by the General Assembly are, as the provision itself expressly states and we have stated, impermissible under Article III, § 49 of the Maryland Constitution.

Constitution as to the place where the right to vote shall be exercised is that it must be in the election district of which the voter is a resident," the Circuit Court concluded that the Constitution entitled qualified voters to cast votes only in the election district in which they reside. It also found that Article 1, § 1 is mandatory and cannot be waived; its instruction is not simply permissive. Accordingly, the Circuit Court rejected the appellants' "entitlement" argument.

The court reasoned that because the case involved constitutional interpretation, and "[t]he Maryland Constitution was carefully written and solemnly adopted by the Constitutional Convention of 1867, and approved by the people of the State," *Buchholtz v. Hill,* 178 Md. 280, 285–286, 13 A.2d 348, 351 (1940), it should be careful not to depart from the plain language of the instrument. Moreover, it continued, while Article III, § 49 gives the General Assembly the power to enact laws that relate to the time, place, and manner of elections, that power is specifically constrained and cannot give rise to laws that are "inconsistent with [the Maryland] Constitution."

Early voting was also found by the Circuit Court to be inconsistent with the requirement in Article XV, § 7 of the Maryland Constitution that "[a]ll general elections in this State shall be held on the Tuesday next after the first of Monday in the month of November, in the year in which they shall occur." The court agreed with the appellees, who argued that the word "held" contemplated a specific time period, a day, when the voters cast the votes,[21] and not, as the appel-

---

21. The Circuit Court opined:

"The Court finds that the common sense meaning of the phrase an election is 'held' on Tuesday refers to the day upon which voters cast their ballots.... Clearly, there are ministerial obligations of the election board to prepare for election day prior to the 'Tuesday next after the first Monday in the month of November,' and there are administrative tasks necessary to tabulate the votes subsequent to that day. The reference to 'election' in Article XV, Section 7 could not possibly have been intended by the framers to refer to the entire election process, which would include those tasks. The election as referred to in Article XV, Section 7 refers to the date when voters cast

lants would have it, the end of the process, *i.e.,* "the date upon which voting is concluded and the transition to tabulating the votes begins."

The Circuit Court was not persuaded by *Foster v. Love,* 522 U.S. 67, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997), which it determined to be inapposite—it only provided that the voting system utilized by a state may not produce a winner in a federal Senatorial and Representative race *prior* to the first Tuesday following the first Monday of November, 522 U.S. at 72, 118 S.Ct. at 468, 139 L.Ed.2d at 375. Nor did the court find the federal cases following *Foster*[22] helpful or persuasive, pointing out that they "all dealt with early voting within the umbrella of absentee ballot provisions."

Finally, the Circuit Court rejected the argument that Article I, § 3, authorizing absentee voting, provided the requisite authority for early voting legislation. On the contrary, referencing § 10–301.1(A)'s express exception of "Absentee Voting" from its coverage,[23] it observed that "[a]s drafted, early voting goes far beyond the specifically authorized absentee voting language, creating a 'no excuse' needed category for voters

their ballots. To suggest that the framers intended that the entire election process would be concluded on the 'Tuesday next after the first Monday in the month of November,' ignores the historical reality. Even in today's world with automobiles, trains, planes, and computers, this cannot be done in most instances. Certainly, in the days of the horse and buggy, it could not be done. So, it is clear to this Court that the framers, by setting forth the date of the election, intended to refer to the date that all qualified voters could appear at the polls to cast their ballots."

**22.** The appellants, at the Circuit Court level, relied on *Voting Integrity Project, Inc. v. Bomer,* 199 F.3d 773 (5th Cir.2000), *Millsaps v. Thompson,* 259 F.3d 535 (6th Cir.2001), and *Voting Integrity Project, Inc. v. Keisling,* 259 F.3d 1169 (9th Cir.2001).

**23.** EL § 10–301.1 provides, as relevant:
" § 10–301.1. Early polling places
"Generally
"(a) *Except as provided under Title 9, Subtitle 3 of this article,* a voter shall vote:
"(1) in the voter's assigned precinct on election day; or
"(2) in an early voting polling place as provided in this section.
(Emphasis added).

who need not be absent or unable to vote personally." That is made clear, the Circuit Court opined, by the explicit language distinguishing absentee voting provisions from the early voting provisions.[24]

Accordingly, the Circuit Court enjoined the appellants from further implementing or enforcing early voting.[25] The appellants immediately noted an appeal of the judgment to this Court[26] and also filed a Petition for Certiorari, which we

---

**24.** *See supra,* n. 9 and n. 10, noting that, prior to amendment, the Absentee Ballot provisions included an "excuse" requirement. The Circuit Court noted, in addition to the exception of Absentee Voting from the Early Voting law, that, "nowhere does the early voting act limit its breadth to those 'who are absent at the time of any election" or "who are unable to vote personally." Thus the early voting acts are inconsistent with and exceed the authority granted in Article I, Section 3."

**25.** The Circuit Court also granted the appellants' Motion to Dismiss as to the State of Maryland, and denied the appellants' Motion to Dismiss all remaining defendants.

**26.** Maryland Code (2003, 2006 Cum.Supp.) § 12–203 of the Election Law Article provides, as relevant:
" § 12–203. Procedure
        "Generally
"(a) A proceeding under this subtitle shall be conducted in accordance with the Maryland Rules, except that:
    "(1) the proceeding shall be heard and decided without a jury and as expeditiously as the circumstances require;
    "(2) on the request of a party or sua sponte, the chief administrative judge of the circuit court may assign the case to a three-judge panel of circuit court judges; and
    "(3) *an appeal shall be taken directly to the Court of Appeals within 5 days of the date of the decision of the circuit court.*
(Emphasis added).
    In addition, Maryland Rule 8–301, entitled "METHOD OF SECURING REVIEW—COURT OF APPEALS," also permits direct appeals to this Court, and provides, as relevant:
"(a) Generally. Appellate review by the Court of Appeals may be obtained only:
    "(1) by direct appeal or application for leave to appeal, where allowed by law;
    "(2) pursuant to the Maryland Uniform Certification of Questions of Law Act; or
    "(3) by writ of certiorari in all other cases.
"(b) Direct Appeals or Applications to Court of Appeals.

granted. *Lamone v. Capozzi*, 394 Md. 307, 905 A.2d 842 (2006). Oral argument was heard on August 25, 2006. By Order issued on that same day, this Court affirmed the judgment of the Circuit Court. We now provide the reasons for our decision.

## B.

This case involves constitutional interpretation. The principles that apply and their application are well settled. We recently restated them in *Roskelly v. Lamone:*

"As early as 1873, this Court recognized that where a 'general rule for the construction of statutes' exists, there 'can be no good reason suggested why this same general principle ... should not also apply as a rule of interpretation of the Constitution.' *New Central Coal Co. v. George's Creek Coal and Iron Co.*, 37 Md. 537, 557 (1873). We continue to adhere to that principle. *Bienkowski v. Brooks,* 386 Md. 516, 536–537, 873 A.2d 1122, 1133–35 (2005). *See Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78, 81 (2004) ('When interpreting constitutional provisions, we generally employ the same rules of construction that are applicable to the construction of statutory language.'); *Fish Market v. G.A.A., Inc.*, 337 Md. 1, 8, 650 A.2d 705, 708 (1994); *Luppino v. Gray,* 336 Md. 194, 204 n. 8, 647 A.2d 429, 434 n. 8 (1994) ('The rules governing the construction of statutes and constitutional provisions are the same'); *Andrews v. Governor of Maryland,* 294 Md. 285, 290, 449 A.2d 1144, 1147 (1982) ('in ascertaining the meaning of a constitutional provision, we are governed by the same rules of interpretation

"(1) An appeal or application for leave to appeal to the Court of Appeals in a case in which a sentence of death was imposed is governed by Rule 8–306.

"(2) Any other appeal to the Court of Appeals allowed by law is governed by the other rules of this Title applicable to appeals, or by the law authorizing the direct appeal. In the event of a conflict, the law authorizing the direct appeal shall prevail. Except as otherwise required by necessary implication, references in those rules to the Court of Special Appeals shall be regarded as references to the Court of Appeals."

which prevail in relation to a statute'); *Brown v. Brown,* 287 Md. 273, 277, 412 A.2d 396, 398 (1980) (the same rules that are applicable to construction of statutory language are employed in interpreting constitutional verbiage); *Perkins v. Eskridge,* 278 Md. 619, 639, 366 A.2d 21, 36–37 (1976) (observing that the same rules apply in constructional construction as apply in statutory construction).

396 Md. at 48, 912 A.2d at 670–71.

■ Thus, when this Court seeks to ascertain the meaning of a constitutional provision, it first will look to the "normal, plain meaning of the language," and, if the language is clear and unambiguous, it will not look past those terms. *Bienkowski v. Brooks,* 386 Md. 516, 536–537, 873 A.2d 1122, 1134–1135 (2005). *See also Comptroller v. Phillips,* 384 Md. 583, 591, 865 A.2d 590, 594 (2005) ("If the plain language . . . is unambiguous and is consistent with the [enactment's] apparent purpose, we give effect to the [enactment] as it is written"); *Lee v. Cline,* 384 Md. 245, 256–257, 863 A.2d 297, 304 (2004); *Collins v. State,* 383 Md. 684, 688, 861 A.2d 727, 730 (2004) ("We begin with the plain language of the [enactments]"); *Arundel Corp. v. Marie,* 383 Md. 489, 502, 860 A.2d 886, 894 (2004) ("If there is no ambiguity in that language [of an enactment], . . . the inquiry as to legislative intent ends; we do not then need to resort to the various, and sometimes inconsistent external rules of construction").

■ Further, when the meaning of a word or phrase in a constitutional or statutory provision is perfectly clear, this Court will not give that word or phrase a different meaning than is plainly understood. *See, e.g., Montrose Christian School v. Walsh,* 363 Md. 565, 595, 770 A.2d 111, 129 (2001) (the "phrase 'to perform purely religious functions' clearly does not mean what is suggested. . . . We decline to construe 'purely' as if it were 'primarily' or 'some' "); *Dodds v. Shamer,* 339 Md. 540, 554, 663 A.2d 1318, 1325 (1995) (refusing to construe a statute, specifically applicable to only four named counties, as applicable to other counties); *Davis v. State,* 294 Md. 370, 378, 451 A.2d 107, 111 (1982) (declining to construe

the phrase in a statute as petitioner requested, finding that such an action would be to re-draft the statute under the guise of construction); *Mauzy v. Hornbeck*, 285 Md. 84, 93, 400 A.2d 1091, 1096 (1979) (refusing to construe the statutory phrase "all professional employees" as "only certain types of" professional employees); *Wheeler v. State*, 281 Md. 593, 598, 380 A.2d 1052, 1054 (1977), *cert. denied*, 435 U.S. 997, 98 S.Ct. 1650, 56 L.Ed.2d 86 (1978) ("We are not at liberty to bring about a different result by inserting or omitting words to make the [enactment] express an intention not evidenced in its original form").

1.

■ It is well settled that a State Legislature may not enact laws that are in derogation of the Constitution. *See Bienkowski v. Brooks*, 386 Md. at 546–547, 873 A.2d at 1140 ("[T]he constitutional authority to implement a constitutional provision, ... does not authorize the General Assembly by statute or this Court by rule to contradict or amend the Constitution); *Washabaugh v. Washabaugh*, 285 Md. 393, 411, 404 A.2d 1027, 1037 (1979) (the constitutional authority to implement Article IV, § 22, by rules does not authorize a rule which is inconsistent with § 22, as this would be a "license ... to make a substantive change in the Maryland Constitution ..., a result we do not think was contemplated by the drafters of section 22"). Indeed, Article III, § 49 of the Maryland Constitution provides:

" § 49. Regulation of elections

"The General Assembly shall have power to regulate by Law, *not inconsistent with this Constitution,* all matters which relate to the Judges of election, time, place and manner of holding elections in this State, and of making returns thereof."

(Emphasis added).

The appellants argue that Article III, § 49 *validates* the General Assembly's constitutional power to regulate the time, place, and manner of elections. They emphasize only a por-

tion of § 49, that portion that gives the General Assembly "power to regulate ... *all matters* which relate to the ... time, place and manner of holding elections in this State." (Emphasis added). This is confirmed, they assert, by the language of Article I, § 4, cl. 1 of the United States Constitution ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof...") and the absentee voting provision, Article I, § 3, of the Maryland Constitution. In addition, the appellants rely on *County Council for Montgomery County v. Montgomery Ass'n, Inc.,* 274 Md. 52, 333 A.2d 596 (1975). That case, they say, makes clear that the Framers intended that the General Assembly should regulate elections, 274 Md. at 60, 333 A.2d at 600, has "pervasive control" over elections, 274 Md. at 62, 333 A.2d at 602, and is "obligated" to enact a comprehensive plan for the conduct of elections. 274 Md. at 64, 333 A.2d at 603.

In *County Council,* Montgomery County enacted three ordinances, designed to regulate the campaign finance practices of candidates for County Executive and the County Council in that county, that provided for the reporting of campaign contributions, a ban on corporate contributions, a limit on contributions from individuals and from candidates to their own campaigns, and a limit on campaign spending. The respondents requested a declaratory judgment that the three ordinances were invalid and sought an injunction prohibiting prosecutions under the ordinances, alleging that the county had not been delegated authority by the General Assembly to enact the ordinances, that the field of regulation of election practices had been completely occupied by the General Assembly in enacting the State Election Code, that the ordinances conflicted with specific provisions of the State Election Code, and that enactment of the ordinances violated the Federal Constitution. 274 Md. at 54, 333 A.2d at 597.

This Court held that election laws enacted by Montgomery County were preempted by state elections laws, and thus, were void. 274 Md. at 64, 333 A.2d at 603. While it is true that this Court, in *County Council,* made the points attributed

to it by the appellants, *County Council* does not stand for the proposition that the General Assembly's role in the regulation of elections is so pervasive or its obligation so great as to enable it to enact laws in derogation of the Maryland Constitution. Nothing in *County Council* suggests that to be the case and the facts of the case do not support that proposition. In fact, to make this argument, the appellants must emphasize, as we have seen them do, just a part of Article III, § 49, and simply disregard the critical provision that the laws passed to regulate elections "not [be] inconsistent with this Constitution."

Stressing that "elections ought to be free and frequent; and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage," *quoting* Md. Decl. Rights., Art. 7, the appellants argue that early voting would facilitate the ability of qualified voters to exercise their franchise, and, in that way, would safeguard the rights of those voters to participate in our democratic system. They rely on *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 667, 86 S.Ct. 1079, 1082, 16 L.Ed.2d 169, 172 (1966), for the proposition that "the political franchise of voting" is a fundamental right that preserves all other basic civil rights, *Kemp v. Owens*, 76 Md. at 241, 24 A. at 608, for the proposition that the elective franchise is the "highest right of the citizen, and the spirit of our institutions requires that every opportunity should be afforded for its fair and free exercise," and the Maryland Declaration of Rights for the proposition that "the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government." Md. Decl. Rights, Art. 7.

They also rely on *Norris v. Mayor & City Council of Baltimore*, 172 Md. 667, 192 A. 531 (1937). In *Norris*, opponents of the use of voting machines argued that their use conflicted with Article I, § 1, which provided that "[a]ll elections shall be held by ballot." This Court rejected the argument that the term "ballot" could not include voting machines, as they did not exist in 1867. We reasoned:

"while the principles of the Constitution are unchangeable, in interpreting the language by which they are expressed it will be given a meaning which will permit the application of those principles to changes in the economic, social, and political life of the people, which the framers did not and could not foresee."

172 Md. at 675–676, 192 A. at 535. The appellants urge that, in light of *Norris,* this Court should reject the "cramped construction of the relevant constitutional provisions" that was employed by the Circuit Court.

■ *Norris* is inapposite. The case *sub judice* does not involve, as *Norris* did, an improvement in technology or social progress that would, in effect, replace an instrument or aspect of the election process, while leaving the overall scheme intact. Early voting, instead, fundamentally *changes* the very principles established in the Constitution. Moreover, while we do appreciate both the right of voters to exercise their franchise and the General Assembly's attempts to make the exercise of that right more convenient and easier, we note that the importance of such a right, nevertheless, does not give the General Assembly *carte blanche* authority to enact laws and implement procedures that are in derogation of the Constitution.

2.

■ That EL § 10–301.1 authorizes voters to cast ballots "beginning the Tuesday before a primary or general election through the Saturday before the election," is clearly inconsistent with the words of, and the plain meaning of Article XV, § 7 and the other constitutional provisions that designate the "Tuesday next after the first Monday of November," as the date of the general election. The appellants argue, nevertheless, that there is *no* inconsistency between the constitutional provisions and the early voting statute. This is so, they submit, because an "election" is not singularly the "casting of a ballot," as the Circuit Court held, but, rather, it is, as articulated by *Foster v. Love,* 522 U.S. 67, 71, 118 S.Ct. 464, 467, 139 L.Ed.2d 369, 374 (1997), "the combined actions of

voters and officials meant to make a final selection of an office holder."

In *Foster*, Louisiana voters brought an action against state officials, alleging that the state's "open primary" system was in conflict with 2 U.S.C. §§ 1 [27] and 7.[28] 522 U.S. at 68–69, 118 S.Ct. at 466, 139 L.Ed.2d at 373. Louisiana used an "open primary" system, enacted in 1975, in which "all candidates, regardless of party, appear on the same ballot, and all voters, with like disregard of party, are entitled to vote." 522 U.S. at 70, 118 S.Ct. at 467, 139 L.Ed.2d at 374. If one candidate won a majority of the votes during that early voting period, he was "elected," "and no further act is done on federal election day to fill the office in question." 522 U.S. at 70, 118 S.Ct. at 467, 139 L.Ed.2d at 374.

The Supreme Court agreed with the challengers that this system conflicted with the federal statutes creating a uniform federal election day. In so holding, it opined that the federal statutes, in reference to "elections," plainly meant the "combined actions of voters and officials meant to make a final selection of an officeholder." 522 U.S. at 71, 118 S.Ct. at 467, 139 L.Ed.2d at 374. By holding the "election" before the federally mandated election day, Louisiana's system was in conflict with federal statutes. 522 U.S. at 72, 118 S.Ct. at 468, 139 L.Ed.2d at 375. The Supreme Court rejected the

---

**27.** 2 U.S.C. § 1 provides:
" § 1. Time for election of Senators
"At the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said State shall be elected by the people thereof for the term commencing on the 3d day of January next thereafter."

**28.** 2 U.S.C. § 7 provides:
" § 7. Time of election
"The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter."

state's rationale that the "open primary" system did not effect the "timing" of the federal election day, but only the "manner" of election. 522 U.S. at 72, 118 S.Ct. at 468, 139 L.Ed.2d at 375. Thus, while, to be sure, *Foster* defines an "election" as the combined action of voters and election officials, the context in which it was applied is instructive. That definition was employed to ensure that federal offices were not filled by elections finalized before the federal election day. *Foster*, therefore, contrary to the appellants' contentions, does not authorize voting on any other than the day specified for an election.

*Foster*, as the appellants point out, has been interpreted by two federal Courts of Appeal, *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773 (5th Cir.2000), and *Millsaps v. Thompson*, 259 F.3d 535 (6th Cir.2001), to permit early voting. Neither of these cases, however, addressed whether the early voting scheme at issue was constitutional under the applicable state constitution. The issue in each case was whether the early voting scheme was preempted by federal law.

In *Bomer*, the United States Court of Appeals for the Fifth Circuit held that Texas' Early Voting statutes did not directly conflict with the federal election statutes establishing a single election day and, therefore, were not preempted. 199 F.3d at 777. The Voting Integrity Project ("VIP") filed a declaratory judgment action against Elton Bomer, the Texas Secretary of State ("State"), challenging Tex. Elec.Code §§ 81.001,[29] 82.005,[30] and 85.001[31] ("the Texas Early Voting statutes").

---

**29.** Texas Election Code § 81.001 provides:
" § 81.001. Early Voting Required
"(a) In each election in this state, early voting shall be conducted by personal appearance at an early voting polling place and by mail.
"(b) A reference in a law outside this code to 'absentee voting' means 'early voting.' "

**30.** Texas Election Code § 82.005 provides:
" § 82.005. Eligibility for Early Voting by Personal Appearance
"Any qualified voter is eligible for early voting by personal appearance."

**31.** Texas Election Code § 85.001 provides:

These statutes authorized voting to begin in Texas federal elections seventeen days before the federal election day; however, they did not allow the election results to be released until the votes were tabulated on federal election day. 199 F.3d at 774. Unlike traditional "absentee" voting, the Texas scheme did not require the voter to give any reason to vote early. 199 F.3d at 774. Arguing that "election" is synonymous with voting, and as such, voting is confined to a single day, the VIP claimed that these statutes violated 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1,[32] which, collectively, established the Tuesday after the first Monday in November as *the day* for the election of federal representatives, senators, and presidential electors throughout the United States.

The Fifth Circuit Court of Appeals, noting that "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with feder-

---

"85.001. Early Voting Period

"(a) The period for early voting by personal appearance begins on the 17th day before election day and continues through the fourth day before election day, except as otherwise provided by this section.

"(b) For a special runoff election for the office of state senator or state representative or for a runoff primary election, the period begins on the 10th day before election day.

"(c) If the date prescribed by Subsection (a) or (b) for beginning the period is a Saturday, Sunday, or legal state holiday, the early voting period begins on the next regular business day.

"(d) If because of the date for which an election is ordered it is not possible to begin early voting by personal appearance on the prescribed date, the early voting period shall begin on the earliest date practicable after the prescribed date as set by the authority ordering the election.

"(e) For an election held on the uniform election date in May, the period for early voting by personal appearance begins on the 12th day before election day and continues through the fourth day before election day."

**32.** 3 U.S.C. § 1 provides:

" § 1. Time of appointing electors

"The electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President."

al election laws on the subject," 199 F.3d at 775, found no conflict. In doing so, it rejected the VIP's argument that, under the statutory language, the entire election, including all voting, must occur on one day. The court concluded:

> "Allowing some voters to cast votes before election day does not contravene the federal election statutes because the final selection is not made before the federal election day."

199 F.3d at 776.

The court relied on *Foster* for the meaning of the term "election," "the combined actions of voters and officials meant to make a final selection of an officeholder." 199 F.3d at 775, *citing Foster,* 522 U.S. at 71, 118 S.Ct. at 467, 139 L.Ed.2d at 374. It also pointed out that *Foster* did not prohibit early voting, only that elections "must not be 'consummated' before federal election day," 199 F.3d at 775, *citing Foster,* 522 U.S. at 72 n. 4, 118 S.Ct. at 468 n. 4, 139 L.Ed.2d. at 375 n. 4. Under the Texas scheme, the court held, the election was not consummated early.

Also critical to the court's reasoning was the effect of a contrary holding on absentee voting. Conceding that, if the early voting statutes at issue were held to be inconsistent with federal law, then absentee balloting would be as well, a result that Congress did not contemplate or seek to effect, the court opined:

> "[W]e cannot logically hold that Texas' system of unrestricted advanced voting violates federal law without also finding that absentee balloting-which occurs in every state-violates federal law.

> "We do not believe that Congress would have allowed absentee balloting to occur under state laws if it attached the meaning to the federal election statutes urged by the VIP. More than a century ago, some states began to allow absentee voting, and all states currently provide for it in some form, ... yet Congress has taken no action to curb this established practice. We are unable to read the federal election day statutes in a manner that would prohibit such a

universal, longstanding practice of which Congress was obviously well aware."

199 F.3d at 776.

*Bomer* does not support the appellants' argument, nor is it analogous to the situation *sub judice*. *Bomer* did not address a state constitutional challenge, which is what is presented in the case *sub judice*. Thus, while, to be sure, the court in that case stated that "[t]he challenged Texas statutes encourage voting by providing Texas voters with more opportunities to vote," 199 F.3d at 777, and "further the important federal objective of reducing the burden on citizens to exercise their right to vote by allowing them to vote at a time convenient to them, without thwarting other federal concerns," *id.*, it did so in the context of a challenge based on preemption as opposed to a state constitutional challenge.

*Millsaps* is similarly unhelpful. There, a challenge similar to that in *Bomer* was brought against Tennessee's Early Voting Statutes ("TEVS"). Again, the plaintiffs in the case argued that the early voting system conflicted with federal statutes that established the first Tuesday after the first Monday in November in even-numbered years as election day for federal office holders.

TEVS allows a voter wishing to vote early to go to the county election commission office within posted hours "not more than twenty (20) days nor less than five (5) days *before the day of the election.* A voter desiring to vote in the early voting period shall sign an application for a ballot." 259 F.3d at 537, *citing* Tenn.Code. Ann. § 2–6–102(a) (emphasis added). Unlike absentee balloting, which required the identification of one of a few specifically enumerated reasons for voting absentee, TEVS established a separate method of early voting that did not require the voter to give any reason for wanting to vote early. 259 F.3d at 537.

As the Fifth Circuit Court of Appeals in *Bomer* had done, the Sixth Circuit Court of Appeals relied on the holdings in *Foster*, that "if an election does take place, it may not be consummated prior to federal election day," 259 F.3d at 544,

*citing Foster,* 522 U.S. at 72 n. 4, 118 S.Ct. at 468 n. 4, 139 L.Ed.2d at 375 n. 4, and that an "election" is "the combined actions of voters and officials meant to make a final selection of an officeholder ..." 259 F.3d at 547, *citing Foster,* 522 U.S. at 71, 118 S.Ct. at 467, 139 L.Ed.2d at 374. Using this rationale, the court concluded that the TEVS did not violate federal law. It explained:

> "So long as no combined action occurs any day other than federal election day, or so long as any such combined action is not intended to make a final selection of a federal officeholder, a State has complied with the federal elections statutes."

259 F.3d at 547.

Moreover, like *Bomer,* the *Millsaps* court was influenced by the adverse effect that an adverse ruling would have on absentee voting:

> "[W]e see no principled distinction between the [TEVS] at issue in this case and the mechanics of absentee voting .... the plaintiffs' argument would apply with equal force to absentee voting and result in a declaration that federal law preempts a widely accepted and long-standing electoral practice."

259 F.3d at 547.

The Sixth Circuit Court of Appeals finally held that no Congressional purpose was frustrated, noting that "there is no reason to think that simply because Congress established a federal election day it displaced all State regulation of the times for holding federal elections." 259 F.3d at 549.

*Millsaps* does not support the appellants' position any more than did *Bomer. Millsaps* also did not deal with a state constitutional challenge to the Tennessee early voting scheme.[33] A determination that a state statute does not

---

33. The Sixth Circuit Court of Appeals did note that, since 1870, the Tennessee Constitution specified the date for the election as "the first Tuesday after the first Monday in November. Said elections shall terminate the same day." Tenn. Const. art. II, § 7. No discussion,

conflict with an existing federal law does not insulate that state's statute from state constitutionality analysis. In sum, *Bomer* and *Millsaps* do not support the appellants' position.

Voting, as the Circuit Court held, must mean the casting of ballots. Indeed, that is the focus of the Constitutional provisions. Article I, § 1, for example, states simply who can vote and where voting may occur. By contrast, there is no constitutional provision that prescribes who may canvass the votes or when or how the votes are to be canvassed; for that matter, no constitutional provision expressly authorizes canvassing or any of the ministerial actions that election officials must perform in conjunction with elections.

■ Article XV, § 7 and the other constitutional provisions prescribing the date of election are clear: the election "shall be held *on* the Tuesday next after the first Monday in the month of November, in the year in which they shall occur." (Emphasis added). There is no constitutional provision that states that voting shall begin on one date and end on another; it merely provides that the election shall be held *on* a specific day. Read in conjunction with Article I, § 1, this provision indicates that, apart from absentee voting, in-person ballot casting must begin and end on the same day. Thus, any statute that allows for a ballot to be cast before the prescribed day must be in derogation of the Constitution.

The appellants, continuing to rely on the meaning *Foster* ascribed to "election," argue that an "election" cannot mean the mere casting of votes. This is so, they say, because an election has not been "held" until the canvassing of the votes has begun, since a voter has not "voted" until and unless his or her ballot has been "counted." They further ask whether an election has been truly "held" if some emergency prevents the cast-ballots from being counted? We are not persuaded. The Constitution contemplates an election in terms of the voter, not in terms of the election process. Moreover, while we

---

however, ensued regarding whether the state early voting scheme is inconsistent with this state constitutional provision.

understand that the appellants would prefer us to center our focus on when an election has been "held," there is no dispute that the "combined actions" must occur, that voting must end, on federal election day. The true issue, then, is deciding when voting can begin. Article XV, § 7 makes clear that ballot casting must begin and end on the same day.

Incidentally, this reading is not inconsistent with *Foster's* definition of the word "election," as expressed by the appellants—"the combined actions of voters and officials meant to make a final selection of an officeholder." These combined actions then, absentee balloting aside, must occur on the Tuesday next after the first Monday in the month of November. This Court is not convinced that it is constitutionally permitted for voting to merely "end" on federal election day, and to begin at any arbitrary prior date.

3.

It is clear from Article I, § 1, that a voter can only vote in the election ward or district in which he resides. Section 10–301.1 of the Election Law Article, however, allows for early voting to occur outside of a person's residential ward, providing for three different early voting polling places in some counties.

As noted already, this Court, to ascertain the actual intent of the framers, interprets constitutional provisions using the same rules of interpretation that relate to the interpretation of a statute, and gives the language of the provision its ordinary, plain meaning. *See Bienkowski v. Brooks,* 386 Md. at 536–537, 873 A.2d at 1133, *Brown v. Brown,* 287 Md. 273, 277–278, 412 A.2d 396, 398 (1980) (holding that the Court generally applies the same principles in construing constitutional provisions as it does in construing statutory language), *Buchholtz v. Hill,* 178 Md. at 286, 13 A.2d at 351.

The appellants contend that Article I, § 1 was enacted to prevent election officials from preventing voters from voting in their own election wards. Accordingly, they maintain, it merely states that a voter "shall be entitled" to vote in the

ward or election district in which he or she resides, and does not *exclude* voters from voting in other wards. Article I, § 1, however, is not ambiguous, and as such, this Court will not look past its plain language. The phrase, "shall be entitled to vote in the ward or election district in which he resides," modifies the preceding phrase, "[e]very citizen of the United States, of the age of 18 years or upwards, who is a resident of the State as of the time for the closing of registration next preceding the election . . . " The phrase, as a whole, designates who is allowed to vote, if they so choose.

The location at which a citizen can vote also is a requirement. Even under the strained interpretation that the appellants' give the phrase, "shall be entitled to vote in the ward or election district in which he resides," the subsequent language of Article I, § 1 bars voting in an election district or ward that a person does not live in. Article I, § 1 states that a person shall be entitled to vote in the ward or election district where he resides *until* he acquires residence in another election district or ward. Therefore, once a voter who resides and votes in a particular ward acquires residence in another election district or ward, that voter's right, his or her entitlement, to vote in the ward where he or she once resided is extinguished. If he or she has the right to vote it is in the newly acquired district or ward.[34]

The appellants state that it is "axiomatic that a person may waive a constitutional right." While this is true of some constitutional rights, e.g., one may waive the right to a trial by jury, *Smith v. State,* 375 Md. 365, 379–81, 825 A.2d 1055, 1064 (2003), a citizen cannot waive a *requirement* of the Constitution. We view the language in Article I, § 1, as a mandatory requirement, and not as a mere "entitlement,"

---

**34.** Resorting to the application of the Latin maxim "expressio unius est exlusio alterius," or the "expression of one thing is the exclusion of another," as urged by the appellees, is unnecessary. It is clear to this Court that the presence of the limiting phrase *"until* he shall have acquired a residence in another election district or ward in this State," (emphasis added), indicates a restriction on voting outside one's residence.

capable of being waived. Therefore, we reject the appellants' argument. *See also* Article 7 of the Declaration of Rights of the Maryland Constitution.[35]

This reading of Article I, § 1 is not new in Maryland. In *Kemp v. Owens,* 76 Md. at 238, 24 A. at 607, this Court stated that "[one] cannot lawfully vote in a ward or election district in which he does not reside, even though that ward or election district be within the legislative district or county where he has residence." The appellants claim that this case in inapplicable, because it merely stands for the proposition that one cannot lawfully vote where he is not registered to vote. This reading, however, ignores the context of the case, in which this Court held that where one cannot lawfully vote, based on Article I, § 1, one cannot lawfully register or *remain registered to vote.* 76 Md. at 238, 24 A. at 607. Further, *Kemp* highlights exactly the scenario described above, where one's voter entitlement extinguishes upon moving from his election ward and establishing residence elsewhere:

> "Owens, having removed from the first precinct of the Twenty–Second ward to the ninth precinct of the Seventh ward, ceased to be entitled to vote in the Twenty–Second ward, but was entitled to vote in the Seventh; both wards being in the same legislative district. In other words, by moving from one ward to another in the same legislative district, he did not lose his right to vote in that legislative district, but he was no longer authorized to vote in the ward from which he had moved."

76 Md. at 238, 24 A. at 607.

In *Smith v. Hackett,* 129 Md. 73, 76–77, 98 A. 140, 141 (1916), voters went to the election ward polling place designat-

---

**35.** Article 7 of the Declaration of Rights of the Maryland Constitution provides:

"Article 7.   Free and frequent elections;   right of suffrage

"That the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government;   for this purpose, elections ought to be free and frequent;   and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage."

ed for them and to which they were directed to cast their votes, but later learned that the polling room's physical location was slightly beyond the lines of the election district. This Court held that the votes they cast were rendered not invalid simply because they were cast outside the district lines. Acknowledging that "[t]he only condition imposed by the Constitution as to the *place* where the right to vote shall be exercised is that it must be in the election district of which the voter is a resident," (emphasis in original), but concluding that the election officials, not the voters, had erred, we opined:

> "The act of the supervisors in locating the polling room in this instance beyond the precinct division line was contrary to the purpose of the law, but the act of the voters of the Second precinct in voting at the only place thus provided for them in the district of their residence was wholly within the right conferred upon them by the Constitution."

129 Md. at 77, 98 A. at 141–142. Thus, because the voters had voted, so far as they knew, where they were supposed to, within the district in which they resided, their votes were required to be counted. 129 Md. at 77–78, 98 A. at 142. Nothing in *Hackett* supports that voters in the instant case can knowingly and actively do what the Constitution does not allow—vote outside of one's residential election district or ward.

Moreover, Article I, § 5 of the Maryland Constitution provides that "[i]t shall be the duty of the General Assembly to pass Laws to punish, with fine and imprisonment, any person . . . who shall vote in any election district, or ward, in which he does not reside. . . ." MD. CONST. art. I, § 5.[36] By requiring

---

36. MD CONST. art. I, § 5 provides, in full:
   "It shall be the duty of the General Assembly to pass Laws to punish, with fine and imprisonment, any person, who shall remove into any election district, or precinct of any ward of the City of Baltimore, not for the purpose of acquiring a bona fide residence therein, but for the purpose of voting at an approaching election, or, who shall vote in any election district, or ward, in which he does not reside, (except in the case provided for in this Article,) or shall, at the same election, vote in more than one election district, or precinct, or shall vote, or

the General Assembly to legislate fines and punishments for persons voting outside their election district or ward, it plainly was the intent of the framers that voting outside of one's residential election district or ward is forbidden.

That EL § 10–301.1 does not *force* voters from traveling outside their ward, but rather provides an "option" of an additional polling place, is irrelevant—by providing an ability to vote outside one's election district or ward, the General Assembly has provided an option that is in derogation of Article I, §§ 1 and 5.

4.

■ The appellants argue that Article I, § 1 of the Maryland Constitution does not apply to the primary elections in Maryland. They do so based on two decisions of this Court— *Hill v. Mayor and Town Council of Colmar Manor*, 210 Md. 46, 122 A.2d 462 (1956), and *Board of Supervisors of Elections v. Blunt*, 200 Md. 120, 88 A.2d 474 (1952), which they cite for the proposition that "the Legislature has plenary powers which are not restricted by the provisions of Article I of the Constitution of Maryland with regard to both primary and municipal elections . . ."

Neither case supports their argument, however. *Blunt* dealt with the State's decision, having switched to voting machines, to limit, by law, voters at a primary election to a choice among the candidates for nomination listed on the official ballot and not permit write-in votes. This Court found that such an action was not unreasonable and did not violate any provision of the state or federal Constitution. 200 Md. at 128, 88 A.2d at 478. Specifically, the Court recognized that the General Assembly had the power to regulate by statute the process of primary elections; this, however, is very different than stating that "Article I, § 1 is inapposite to primaries."

offer to vote, in any name not his own, or in place of any other person of the same name, or shall vote in any county in which he does not reside."

In *Hill*, the question posed was whether primary elections for town Councilman pursuant to a town charter were required to be treated the same as general elections; specifically, the issue was whether the holding in *Blunt* prevented write-in votes from being accepted at a general election. 210 Md. at 53, 122 A.2d at 466. The Court in *Hill* noted that the town "was incorporated by Chapter 178 of the Acts of 1927, and its charter, as amended, constitutes Sections 373 to 415, inclusive, of the Code of Public Local Laws of Prince George's County (Everstine, 1953 Edition)," 210 Md. at 48, 122 A.2d at 463, and that, in determining whether write-in votes were allowable under the town charter, "[t]he question is one of legislative intent, not of constitutional right nor yet of legislative power." 210 Md. at 57, 122 A.2d at 468. Again, the issue was whether the local town charter had the intention of preventing write-in ballots from being accepted at a general election; *Hill* does not state that Article I, § 1 is inapposite to primary elections.

We adopt the analysis offered by the Circuit Court in holding that primary elections are included within the meaning of "at all elections to be held in this State" in Article I, § 1: if Article I, § 1 were read to exclude primary elections, "such a reading could lead to an absurd result, as it would eliminate *all* Constitutional qualifications for primary elections. Thus, a 12 year-old, non-U.S. citizen, residing in Virginia, would not be barred by the [Maryland] Constitution from voting in the Maryland primary election." Such a reading simply cannot be correct.

## C.

██ Having established that early voting is not authorized under Article I, § 1, the constitutional provision that authorizes in-person balloting, we also hold that early voting is not a form of absentee voting, authorized by Article I, § 3 of the Maryland Constitution. Article I, § 3 provides:

"The General Assembly of Maryland shall have power to provide by suitable enactment for voting by qualified voters

of the State of Maryland who *are absent at the time of any election in which they are entitled to vote* and for voting by other qualified voters *who are unable to vote personally* and for the manner in which and the time and place at which such absent voters may vote, and for the canvass and return of their votes."

(Emphasis added).

Article I, § 3 plainly provides that the General Assembly shall have the power to provide for voters who are "absent" and for voters who are unable to vote "personally." Absentee balloting is the only other alternative to in-person day-of voting. This process includes a number of rules and regulations to ensure validity and fairness.[37]

To be sure, the reasons that permitted a voter to vote absentee no longer apply, having been removed from § 9–304 by Chapter 6, § 1, Maryland Laws 2006. The appellants rely upon, and take solace from, that fact. The appellants acknowledge that Article I, § 3 authorizes only "absent" voters or those "unable to vote personally" to vote absentee, but claim that the phrase "unable to vote personally" is subject to interpretation. They claim that anyone who finds the voting time to be "inconvenient" may be "unable to vote personally," due to work hours, family obligations, and other similar reasons. Therefore, the appellants assert, early voting, as it allows those inconvenienced individuals who are "unable to vote personally" to vote earlier at a more convenient time, is authorized by Article I, § 3.

We, however, are not convinced that the amendment of the absentee statute to delete the need for "reasons" suffices to equate absentee voting with early voting. We reject the appellants' argument and hold that Article I, § 3 clearly indicates that the inability to vote personally applies to "ab-

---

**37.** An absentee ballot, as we have seen, is one that is "not used in a polling place, EL § 1–101(a). It can be requested by a voter by application, EL § 9–305, *supra* n. 3, or by agent, EL § 9–307, filled out and returned to the State Board of Elections by special envelope, EL § 9–310, or by agent. EL § 9–307.

sent" voters, not those who find the voting day to be inconvenient. If the inconvenience is so great as to render them "absent" and prevent them from voting on the election day, these individuals can vote using an absentee ballot.[38]

Moreover, and more to the point, it matters little that the "excuse" qualifications that previously were in EL § 9–304 and EL § 9–305 [39] have been removed. People who are voting early under Md.Code § 10–301.1 are not absent nor are they unable to vote personally; instead, they are voters casting ballots in person, early. EL § 9–101(a) makes clear that they are not absentee voters; they are voting by a ballot used in a polling place. Early voting is not absentee voting and, thus, is

---

**38.** Last minute "inconveniences" are largely accommodable, even those that are unable to be anticipated. A voter can apply for an Absentee Ballot up until the Tuesday preceding an election, EL § 9–305(b), and can have an agent deliver the ballot, EL § 9–307. Moreover, Code of Maryland Regulations ("COMAR") 33.11.03.08(b), states:

"B. In General. An absentee ballot is considered to have been timely received only if:

"(1) The ballot is received by the local board office before the polls close on election day; or

"(2) The ballot:

"(a) Is received by the local board office from the United States Postal Service or a private mail carrier:

"(i) On or before 10 a.m. on the second Wednesday after a primary election preceding a gubernatorial election; or

"(ii) On or before 10 a.m. on the second Friday after a general or special election or in a primary election preceding a presidential election; and

"(b) Was mailed before election day, as verified:

"(i) By a postmark of the United States Postal Service, an Army Post Office, a Fleet Post Office, or the postal service of any other country; or

"(ii) By the voter's affidavit that the ballot was completed and mailed before election day, if the return envelope does not contain a postmark or the postmark is illegible."

**39.** Maryland Code (2003, 2005 Cum.Supp.) § 9–305 of the Election Law Article stated as relevant, before amendment:

"(a) An application for an absentee ballot, signed by the voter, may be made:

"(3) in a written request that includes:

"(iii) the reason, as authorized in § 9–304 of this subtitle, for absentee voting."

not authorized by Article I, § 3.[40]

Nor are we persuaded by the appellants' additional argument, that renaming the "early voting" acts as "no excuse absentee balloting" eliminates the Article I, § 3 problem. Putting aside, for a moment, that Article I, § 3 does not authorize this form of voting, however titled, had the General Assembly wished for the early voting acts to be truly considered as "no excuse absentee balloting," such intent would, and should, have at least been expressed in the title of the acts. Article III, § 29 of the Maryland Constitution provides, as relevant:

"... every Law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title; and no Law, nor section of Law, shall be revived, or amended by reference to its title, or section only; nor shall any Law be construed by reason of its title, to grant powers, or confer rights which are not expressly contained in the body of the Act...."

MD CONST. art. III, § 29.[41]

This Court has stated that, in order to convey to the public what the chapter means, the title of an enactment must

---

The statute, as amended, has removed the provisions requiring an § 9–304 excuse.

**40.** The appellants note that "[i]f the lower court's decision is correct, then all voters (perhaps with the exception of traditional absentee voters acting under Title 9, Section 3, of the Election Law article) must be physically present to vote on Tuesday." The appellants, here, are correct.

**41.** Article III, § 29 of the Maryland Constitution provides, in full:
"The style of all Laws of this State shall be, 'Be it enacted by the General Assembly of Maryland:' and all Laws shall be passed by original bill; and every Law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title; and no Law, nor section of Law, shall be revived, or amended by reference to its title, or section only; nor shall any Law be construed by reason of its title, to grant powers, or confer rights which are not expressly contained in the body of the Act; and it shall be the duty of the General Assembly, in amending any article, or section of the Code of Laws of this State, to enact the same, as the said article, or section

"shed[ ] substantial light on what the General Assembly had in mind," when it enacted the legislation. *Board of County Comm'rs v. Stephans,* 286 Md. 384, 395, 408 A.2d 1017, 1022 (1979). *See also Migdal v. State,* 358 Md. 308, 323, 747 A.2d 1225, 1233 (2000) (noting that the purpose of constitutional single-subject rule is to avoid the necessity for a legislator to acquiesce in a bill he or she opposes in order to secure useful and necessary legislation and to prevent the engrafting of foreign matter on a bill, which foreign matter might not be supported if offered independently); *City of Baltimore v. State,* 281 Md. 217, 225, 378 A.2d 1326, 1330 (1977) (noting that the purpose of the title requirement is to inform the members of the legislature and the public of the nature of the proposed legislation), *City of Bowie v. County Commissioners,* 258 Md. 454, 467, 267 A.2d 172, 179 (1970) (noting that the title must fairly describe the real nature of the statute). Moreover, *Bell v. Board of Comm'rs,* 195 Md. 21, 32–33, 72 A.2d 746, 751–752 (1950) dictates that any change in the laws must be marked, and clear, from the titles of the new enactments. If early voting were a form of "no excuse" absentee voting, the General Assembly should have noted such intent in the title of the enactment.[42]

Because the acts authorizing EL § 10–301.1 are inconsistent with and in derogation of certain provisions of the Maryland Constitution, in particular, Article XV, § 7, and Article I, § 1, and are not constitutionally supported by Article I, § 3, we find these acts to be unconstitutional, and thus void.

COSTS TO BE PAID BY THE APPELLANTS.

---

would read when amended. And whenever the General Assembly shall enact any Public General Law, not amendatory of any section, or article in the said Code, it shall be the duty of the General Assembly to enact the same, in articles and sections, in the same manner, as the Code is arranged, and to provide for the publication of all additions and alterations, which may be made to the said Code."

42. The Early Voting Acts, in addition, were codified as a new § 10–301.1—the section of the election law dealing with polling sites, election judges, and polling place procedures, and not as an extension of the absentee balloting laws, codified at §§ 9–301 to 9–312.